**WILLIAM GOLDMAN THEATRES, Inc., v.
LOEW'S, Inc., et al.**

No. 2877.

District Court, E. D. Pennsylvania.

April 8, 1944.

Francis T. Anderson and William A. Gray, both of Philadelphia, Pa., for plaintiff.

George Wharton Pepper and Morris Wolf, both of Philadelphia, Pa., Joseph M. Proskauer and J. Alvin Van Bergh, both of New York City, and Louis J. Goffman, of Philadelphia, Pa., for defendants Warner Bros. Pictures and others.

William A. Schnader, Bernard G. Segal, and J. Pennington Straus, all of Philadelphia, Pa., and C. Stanley Thompson and John F. Caskey, both of New York City, for defendants Loew's Incorporated, and others.

KIRKPATRICK, District Judge.

This is a civil action for injunctive relief and damages, based upon an alleged conspiracy among the defendants to monopolize the motion picture business in Philadelphia.

Since November 9, 1940, the plaintiff, who is an experienced and successful motion picture theatre operator, has been the lessee of the Erlanger Theatre—a large, modern theatre, handsomely appointed, located at 21st and Market Streets, in what might be called the fringe of the downtown Philadelphia theatre district, and suitable for the exhibition of first run feature pictures.

One group of the defendants (Warner Brothers Pictures, Inc., Vitagraph Inc., Stanley Company of America, Inc., and Warner Brothers Circuit Management Corporation) are closely affiliated corporations and, for convenience in this discussion, may be treated as one, under the name of Warner. Warner is engaged in all branches of the motion picture business, production, distribution and exhibition. It operates seven of the largest, finest and best located theatres in Philadelphia. The remaining defendants (who will be referred to as the Distributors) are engaged in the business of distributing pictures throughout the United States. All but one of the Distributors are also producers and all but three are also exhibitors. Together with Warner, they control the production and distribution of more than 80 percent of the feature pictures available for exhibition in the United States, including probably a still higher percentage of feature pictures rated as grade A on the basis of merit and box office value.

The Distributors and Warner have refused to lease grade A feature pictures to the plaintiff for first run exhibition at the Erlanger. It is a fact that, without access to the first run of the defendants' pictures, the plaintiff cannot successfully operate the Erlanger Theatre as a first run theatre. As a result of his inability to obtain the defendants' first runs he has incurred financial loss.

Certain well-known practices of the motion picture business must be borne in mind. Motion picture films are copyrighted and are licensed, usually through distributors, to exhibitors under contracts containing clearance provisions, by which it is provided that they will not be licensed generally for exhibition until the expiration of a certain specified period after their first run. This practice applies to grade A feature films and is general in the larger cities throughout the United States. Another established practice is block booking. Ordinarily a distributor will not license any exhibitor for less than the entire number of pictures produced or controlled by it for a specified period of time, not less than a year. Clearance provisions and block booking, per se, as trade practices, have not, so far as I know, been held illegal by any court, although they may undoubtedly be used as instruments of monopoly or restraint of trade and, in fact, such restraints could hardly be accomplished in the motion picture industry without their use. At any rate, in this action they are not attacked as illegal; nor could they well be, since the very relief which this plaintiff seeks of

necessity involves his being allowed to participate in the system which those practices have created.

The plaintiff asserts that the refusal of the defendants to give him first run feature pictures is the result of a conspiracy to monopolize "the entire film industry in this District" (which, of course, means to monopolize the first run business in Philadelphia by giving it to Warner). The action is brought under Sec. 2 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 2. Although the prayer for injunctive relief mentions restraints of interstate commerce and discriminatory prices, the acts complained of in the body of the complaint are described exclusively as conspiring to monopolize, and the result of the acts is described as "said monopoly" and "monopolistic condition." No restraints of commerce other than the alleged conspiracy to monopolize are specified.

By separate contract with each of the Distributors, prior to November 9, 1940, all the grade A feature pictures licensed by the Distributors and Warner for first run exhibition in Philadelphia have been licensed exclusively to Warner; and it may be said at the outset that the plaintiff's evidence establishes that, as a result of substantially uniform action by each distributor with Warner, Warner has obtained, in Philadelphia, a controlling position in the exhibition of first run grade A feature pictures, which I shall assume can be properly described as a monopoly, according to the popular understanding and dictionary definitions of that term. I think that statement covers the whole of the plaintiff's case on the facts. It remains to be seen whether it is sufficient to support his cause of action.

■ There is no substantial evidence on which a finding could be based, that there was any agreement of the Distributors among themselves to confer a first run monopoly upon Warner. One might suspect such agreement but I can only say that it has not been proved in this case. Uniformity of action, even in the matter of fixing prices, without more, is not evidence of agreement or conspiracy. United States v. International Harvester Company, 274 U.S. 693, 708, 47 S.Ct. 748, 71 L.Ed. 1302.

There is no evidence that in making the contracts complained of either Warner or the Distributors departed from a normal policy or put into operation "far-reaching changes in their business methods"—a fact which the Supreme Court in Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 473, 83 L.Ed. 610, regarded as giving support to the inference that what was done was the result of a general agreement.

■■ It is the right "'long recognized,' of a trader engaged in an entirely private business, 'freely to exercise his own independent discretion as to the parties with whom he will deal.'" Federal Trade Commission v. Raymond Bros.-Clark Co., 263 U.S. 565, 573, 44 S.Ct. 162, 164, 68 L.Ed. 448, 30 A.L.R. 1114. If the reason of any one of the Distributors for preferring Warner is sound it would apply as much to the other Distributors and, therefore, such preference alone is not necessarily evidence of an agreement. The plaintiff has not shown that the Distributors' uniformity of action is reasonably explainable only on the basis of an agreement or conspiracy; hence, the innocent inference that there was no such agreement will be drawn.

The plaintiff's case, however, does not necessarily fall with failure to prove that the Distributors had an agreement with one another. In the Interstate case the Supreme Court not only held that there was sufficient evidence to support the District Court's finding of concert of action among the distributors in that case but it went much further. The court said that, under the circumstances of that case an agreement among the distributors was not a prerequisite to an unlawful conspiracy. "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it."

■ In the present case it can hardly be denied that Warner desired and contemplated that first runs of grade A pictures should be shown only in its theatres and, for its own protection if nothing else, that other exhibitors should be excluded from access to such films until after its clearance periods. And it is not seriously controverted that each distributor knew that every other distributor was leasing its pictures for first run to Warner to the exclusion of other exhibitors. I have not overlooked the fact that this action is based upon Sec. 2 of the Act but that fact, if anything, puts this plaintiff in a still better position so far as dispensing with proof of an agreement between distributors is concerned. Admittedly each dis--

tributor made a separate agreement with Warner and if the purpose or affect of each such agreement was illegally to monopolize interstate commerce I think the action could be supported. It is true that an indictment for a general conspiracy will not be supported by the proof of a number of smaller conspiracies even though they had the same objective as the general one charged, but the niceties of criminal pleading do not apply in a civil suit, particularly under the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. If there is a technical variance, it certainly does not operate to the surprise or prejudice of these defendants in their defense. Nor do I think that there is any reason why, even though the Distributors were not included, this action might not be carried on against Warner alone, were the other elements of illegality present.

■ This brings us to what appears to me to be the controlling issue and the point at which the plaintiff's case fails. I find no evidence that the defendants by the acts described above have either actually imposed or have intended to impose an unreasonable or undue restraint upon interstate commerce. This element is just as necessary to proof of a plaintiff's cause of action under Sec. 2 as under Sec. 1 of the Anti-Trust Law. Granting that the situation created by the defendants in Philadelphia is a monopoly in the popular sense, the question still remains whether their acts constitute monopolizing or attempting to monopolize interstate commerce within the meaning of Sec. 2 as that section has been interpreted by the Supreme Court.

■■ Ordinarily, in construing a statute the commonly understood meaning of a word in common use will be accepted. But the court may find that a special or limited meaning was intended. In Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 516, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, the Supreme Court carefully considered the scope of Sec. 2, as well as Sec. 1 and, if any one thing is plain from the learned and comprehensive discussion in the opinion, it is that, whatever the generally accepted meaning of the words might be, the statute did not intend to include or prohibit in the second section any acts unless they either did or were intended to unreasonably restrain interstate commerce. To that extent the words have a special or limited statutory meaning.

Discussing Sec. 2 the Court said, "Undoubtedly, the words 'to monopolize' and 'monopolize,' as used in the section, reach every act bringing about the prohibited results. The ambiguity, if any, is involved in determining what is intended by monopolize. But this ambiguity is readily dispelled in the light of the previous history of the law of restraint of trade to which we have referred and the indication which it gives of the practical evolution by which monopoly and the acts which produce the same result as monopoly, that is, an undue restraint of the course of trade, all came to be spoken of as, and to be indeed synonymous with, restraint of trade. In other words, having by the 1st section forbidden all means of monopolizing trade, that is, unduly restraining it by means of every contract, combination, etc., the 2d section seeks if possible, to make the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by the 1st section, that is, restraints of trade, by any attempt to monopolize, or monopolization thereof, even although the acts by which such results are attempted to be brought about or are brought about be embraced within the general enumeration of the 1st section." The whole opinion should be read but the excerpts quoted are sufficient to show clearly that the court was of the opinion that the second section was not intended to expand the objectives aimed at in the first, namely, the results of the prohibited conduct, but rather intended as a catch-all to cover every possible means or device by which those results, namely, unreasonable restraint of commerce, might be accomplished. Whatever expansion of Sec. 1 it did accomplish was in the field of methods. Probably it was believed that means for unreasonably restraining commerce which did not violate the letter of Sec. 1 might be evolved, as for example the purchase of controlling interests in competing businesses, or perhaps other expedients not definitely in mind. The Supreme Court said that Sec. 2 was "intended to supplement the 1st, and to make sure that by no possible guise could the public policy embodied in the 1st section be frustrated," and that whole statute was intended to protect commerce from being unduly restrained by methods "whether old or new."

Indicative of the fact that the second section was directed to means, methods and devices rather than results is the fact

that it nowhere uses the word "monopoly" but forbids monopolizing or attempts to monopolize.

Thus approaching, as we must, the meaning of Sec. 2 through Sec. 1, the conclusion is that a state of control may exist which is a monopoly in the ordinary sense of the word and yet is not necessarily within the prohibition of the Anti-Trust Law. To be so, it must unreasonably restrain interstate commerce. In the present case the plaintiff has failed to prove that vital fact.

There is no satisfactory evidence of overbuying or dissipation of product, that is, the purchase of more films for first run than can be profitably exhibited with the result that some are turned back to the exhibitor and not seen by the public at all and others shown for an inadequate period —factors which were important in White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 129 F.2d 600, and Gittone v. Warner Bros. Pictures, D.C., 30 F.Supp. 823.

It has not been shown that admission prices at the Warner theatres are exorbitant or unreasonably high.

It does not appear that there was any great need for another first run theatre in Philadelphia or that the Warner theatres do not adequately serve the needs of the public. As long as the system of block booking remains in force the only result, so far as the public is concerned, of permitting the plaintiff to compete for licensing would be that certain pictures would be shown on their first run at the Erlanger instead of the Aldine, Boyd or one of the other Warner theatres.

It was not shown to my satisfaction, and in fact, was not alleged, that the exclusive control which its contracts with the distributors have given Warner has been injurious to the public. I do not mean to say that the absence of a detriment to the public of itself is fatal to the plaintiff's case. If the defendants have violated the law, the plaintiff would be entitled to a judgment, since he has unquestionably suffered loss, even though the public were benefited.

There is no evidence of a purpose to injure this plaintiff or drive him out of the motion picture business in Philadelphia. As a matter of fact he is and has been for a number of years operating, with marked success, a string of second run theatres in downtown Philadelphia and outlying sections. Of course, the intent is patent—necessarily inferable from the contracts themselves—to exclude the plaintiff and all others except Warner from the first run business.

In general, it does not appear that the conduct of the defendants has eliminated needed outlets for first run feature films and so diminished shipments or curtailed the showing of such films to the public.

There remains the question whether, in the absence of proof of an actual restraint of commerce or an attempt to restrain commerce, the possibility that Warner may at some time illegally exercise the power given it by its controlling position in Philadelphia under its contracts with the Distributors makes the conduct of the parties illegal under the second section. This possibility is undoubtedly present. So long as Warner continues to be the only exhibitor of first run feature pictures in Philadelphia there is nothing to prevent it from raising prices to any point which it thinks the traffic will bear, nor is there anything in its contracts which prevent it from curtailing the exhibition of films, in the number presented or the time of their runs.

In United States v. Pullman Co., D.C., 50 F.Supp. 123, 134, the Circuit Court Judges of the Third Circuit sitting as an Expediting Court held that "Monopoly being clearly established any number * * * of its baleful practices need not be shown to prove that the statute is violated." The District Court in United States v. Aluminum Co. of America, 44 F.Supp. 97, thought otherwise, but I would feel bound by the ruling in the Circuit if the facts presented in this case were even remotely similar to those in the Pullman case. However, it will be seen that the two cases are different at a most essential point, particularly pointed out and stressed in the Pullman case. The Court in that case said, "We have found no other case among the many to which we have been referred presenting such effective and complete monopolization of a given field by the sole proprietor in that field. This being so, we do not feel that there is point in the expenditure of paper and ink in discussing the applicability of cases where the court struggled with the question of the legal effect of partial control of a given market. The very point of such cases is to determine whether what has been done has gone far enough. Here what has been done has gone as far as it is possible to go, that is complete domination of the market."

In the present case, whatever Warner's position may be called, it amounts at best to a partial control of the business of exhibiting motion pictures in a limited area. Although I have so assumed, it is by no means certain that it even meets the popular conception of monopoly at all. Warner operates only a small part of the total number of theatres in Philadelphia. Every picture it exhibits, may be, and most of them are, shown in ther theatres, though, of course, at a later date. This case, clearly falls into the class which the Expediting Court referred to as "cases where the court struggled with the question of the legal effect of partial control of a given market." The distinction seems to be that, where the monopoly is complete, absolute and nationwide in the whole industry, the illegal intent to restrain interstate commerce is a necessary inference, whereas in cases of partial or local control the illegal purpose remains a fact to be proved and may be proved only by what has been done or by direct evidence of the purpose of the combination, not by what might have been done. And so, in a case which involves as limited a control as the present one, I think that the criterion is not whether there is a possibility of restraint in interstate commerce, but whether the control actually accomplishes or is intended to accomplish such undue or unreasonable restraint. Evidence of such results or intent is lacking.

Judgment may be entered for the defendants.

The foregoing discussion has been directed to what seems to me to be the essential issue in the case and if the conclusion reached is correct the defendants are entitled to judgment. A number of other issues are raised by the requests and in the briefs filed by the parties. Although the rules do not require specific answers to every request I shall try to dispose of them so far as it appears to be necessary in order to meet these other issues.

#### Finding of Facts

The statements of fact and law appearing in the opinion may be taken as special findings and conclusions. In addition I make the following findings and conclusions by way of answers to requests. In all cases the requests affirmed may be considered as modified by such part of the discussion as relates directly to the facts and conclusions which they embody.

I affirm the plaintiff's first 10 requests for findings of fact.

Requests number 11, 12, 27 and 29 have to do with the opening by Warner of the Mastbaum Theatre. 11, 12 and 27 may be taken as affirmed, but I consider them immaterial. I do not regard the successful operation of that theatre as evidence that from November 9, 1940 there was room for and need of a first run picture theatre in Philadelphia and consequently I refuse request No. 29. There is no evidence that the reopening of the Mastbaum would have been justified by any public demand at any date substantially earlier than that on which it was opened. It appears from the testimony, and the fact is known to all, that expansion in war industry in and about Philadelphia during the period in question caused a marked increase in the theatre going public and particularly in the class with money to spend on first run grade A pictures. The evidence shows that during that period there was an extension in the average playing time for such pictures at the other six Warner theatres and also an increase in the number of pictures deemed grade A, which two factors created a surplus which because of increased wartime attendance could be profitably shown at the Mastbaum.

Request No. 14 is affirmed in the language of the stipulation on which it is based. Namely, "each of the defendants produce its motion pictures in States other than the State of Pennsylvania and manufactures or causes to be manufactured the positive prints which are used for exhibition in theatres in States other than the State of Pennsylvania, principally New York, New Jersey, and California, and causes the positive prints used by the theatres in Philadelphia to be shipped from points outside the State of Pennsylvania into its office or exchange in Philadelphia for the purpose of delivery to the theatre at which the same is to be exhibited."

Requests Nos. 15 and 16 are affirmed.

Requests Nos. 17, 19 and 24 are affirmed.

Requests Nos. 22, 23, 25 and 30 are affirmed without the words "for no good reason but" in request No. 30.

Requests Nos. 18, 20, 21 and 28 are answered by the general finding that the plaintiff has suffered financial injury by reason of the refusal of the Distributors to license first run feature pictures for exhibition at the Erlanger Theatre.

Request No. 26 is affirmed.

Request No. 31 is affirmed.

Requests Nos. 32, 33, 34, 35, and 37 are all denied. These call for findings that the defendants are illegally monopolizing the business of exhibiting first run feature pictures in Philadelphia.

What is meant by monopolize in the second section of the Sherman Act has been fully discussed. I have indicated that it is, in my judgment, immaterial that Warner's position in Philadelphia may or may not be correctly described as a monopoly in the popular sense of the word. The opinion of the Supreme Court in the Standard Oil case makes it perfectly plain that the court considered that the popular conception of a monopoly was not the criterion to be applied. As I have found, there was no undue restraint of interstate commerce involved and consequently no monopolizing within Sec. 2 of the statute.

Request No. 26. By this request the plaintiff attempts to bring the present case in line with Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L. Ed. 610, and present the picture of a buyer with monopoly powers compelling his sellers to restrict the opportunities of other buyers. I shall affirm the request but qualify it by adding that there is no evidence to show that such "potentially coercive power" was ever strong enough to compel any distributor to make any contract or adopt any policy which it would not otherwise have made or adopted, and further, that there is no satisfactory evidence that Warner exercised or attempted to exercise any coercive power upon any distributor. In this the case differs widely from the Interstate case in which the proof of actual coercion was clear. I have no doubt that the size and importance of the Warner interests were factors which entered into the decision of each of the Distributors to license its product to Warner in Philadelphia. The mere fact, however, that it may have appeared advantageous for any distributor to deal with Warner does not amount to coercion. Coercion means compulsion to do something against one's will or wish, and there is no satisfactory evidence that Warner either exercised or had such power.

### Warner Requests

I affirm requests Nos. 11, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, and 36. Requests Nos. 29 to 36, inclusive, all begin with the words "There is no evidence from which a factual inference may be drawn that", etc. In affirming them, I do not mean to say that none of the inferences stated are possible. I prefer to begin each of these findings with the words "There is no evidence from which I draw the inference that", etc. They may be taken as so modified.

No. 30 is affirmed with the further modification that "advantage" means the long run advantage, involving considerations of continued satisfactory business relations, general policy and ultimate pecuniary benefit. I do not mean to say that none of the defendant distributors could not have obtained a higher percentage return on a first licensing to the plaintiff at the Erlanger.

### Distributors' Requests

Requests Nos. 24, 25, 26, 27, 28, 29, 30, 31, 32, 41, 44, 49, 56, 59, 64, 72, 84 are affirmed.

The remaining requests presented by Warner and the distributors are not answered as findings upon these points are deemed unnecessary.

### Conclusions of Law

### Plaintiff's Requests

The conclusions Nos. 1 and 8 are affirmed.

Requests Nos. 1, 7, and 8 are affirmed. All others are denied.

Requests Nos. 3, 4, 5, and 6 have to do with the burden of proof and inferences to be drawn from the failure to call witnesses. Obviously they are based upon the opinion of the Supreme Court in the Interstate Circuit, Inc., v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. In that case the plaintiff presented a case which logically required answer and the inferences to be drawn from the failure of the defendants to call witnesses was justified by the state of the record. That is not the situation in the present case. In Schad v. Twentieth Century-Fox Film Corp., 136 F.2d 991, the Circuit Court of Appeals for the Third Circuit sustained a dismissal in a case in which the defendant produced no evidence whatever.

### Warner Requests

All requests are affirmed.

### Distributors' Requests

All requests are affirmed.