WILLIAM GOLDMAN THEATRES, Inc., v. LOEW'S, Inc., et al.

No. 8639.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 8, 1945.

Decided Aug. 2, 1945.

Rehearing Denied Sept. 21, 1945.

740

William A. Gray and Robert Dechert, both of Philadelphia, Pa. (Francis T. Anderson and Barnes, Dechert, Price and Smith, all of Philadelphia, Pa., on the brief), for appellant.

Robert L. Wright, Sp. Asst. to Atty. Gen. (Elliott H. Moyer, Sp. Asst. to Atty Gen., and Wendell Berge, Asst. Atty. Gen., on the brief), for amicus curiae.

Bernard G. Segal, of Philadelphia Pa., (Wm. A. Schnader, John E. Mulder, and Schnader, Kenworthey, Segal & Lewis, all of Philadelphia, Pa., on the brief), for Loew's et al., distributor appellees.

Joseph M. Proskauer, of New York City, and George Wharton Pepper, of Philadelphia, Pa. (Morris Wolf, of Philadelphia, Pa., and J. Alvin Van Bergh, of New York City, on the brief), for Warner appellees.

Before PARKER and BIGGS, Circuit Judges, and LEAHY, District Judge.

LEAHY, District Judge.

■ The question we meet is whether plaintiff has supported its charge of illegal monopoly that defendants have violated § 2 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. § 2,[1] in order to support an action for injunctive relief and triple damages under § 4 of the Clayton Act [2] 38 Stat. 731, 15 U.S.C.A. § 15. Plaintiff relied too on § 1 of the Sherman Act,[3] 50 Stat. 693, 15 U.S.C.A. § 1; and while this section states an additional offense "the two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1." [4] There are eleven defendants [5] engaged in three phases of the moving picture business: (1) producers, (2) exhibitors, and (3) licensors of pictures to others for ex-

---

[1] § 2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * * shall be deemed guilty of a misdemeanor * * *."

[2] § 4. "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[3] § 1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States * * * is hereby declared to be illegal * * *."

[4] United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226, 255, 60 S.Ct. 811, 816, 846, 84 L.Ed. 1129, note 59.

[5] Universal Corporation was eliminated by agreement.

hibition.[6] Plaintiff conducts the particular business of operating moving picture theatres in Philadelphia, its environs, and in other parts of Pennsylvania. Defendants did not offer any counter proofs in support of their own case. The district court filed its findings of fact, conclusions of law and opinion (54 F.Supp. 1011) and entered judgment in favor of defendants.

After plaintiff completed the presentation of its evidence before the trial court, defendants asked for several days adjournment. At that time counsel for defendants advised the Court below that they had not decided whether or not they would "make a motion to dismiss, whether or not to close without offering any testimony and make a motion for judgment on the record as it then stands."[7] Upon the resumption of the trial several days later, plaintiff asked to reopen and adduced additional evidence. The record fails to disclose whether defendants made a formal motion for dismissal. Apparently defendants simply sought judgment on the ground that upon the facts and the law the plaintiff had shown no right to relief.[8]

Certain primary facts were found by the Court below. There can be no possible disagreement about these findings.[9] Warner Brothers, owning Vitagraph, Circuit Management and 99% of Stanley, is a producer and exhibitor of motion pictures in various parts of the United States, including Philadelphia. Since November 9, 1940, Stanley has owned or leased and operated all of the theatres in Philadelphia in which first-class motion pictures have been exhibited on "first-run"[10]—that is, at the Stanton, Stanley, Aldine, Earle, Mastbaum, Boyd and Fox Theatres. These theatres were acquired by Warner Brothers between 1919 and 1936. Since 1936 these theatres[11] have exhibited first-class features. Concededly, Warner Brothers intend to continue such showings. No such pictures are to be leased to plaintiff. The Court below found that Warner Brothers now have an actual 100% monopoly in the business of exhibiting feature motion pictures on first-run in Philadelphia, because of substantially uniform action by each of the seven defendant distributors. These distributor defendants and Vitagraph control the production and distribution of more than 80% of the feature pictures available for exhibition in the United States.

Plaintiff, having been engaged in the business of exhibiting motion pictures in and about Philadelphia for many years, is completely qualified to operate a first-run motion picture theatre in Philadelphia. In 1940, plaintiff decided to enter the first-run business.[12] The Erlanger Theatre, located

---

[6] Defendant Loew's, Inc. ("Loew's"), Paramount Pictures, Inc. ("Paramount"), R. K. O. Radio Pictures, Inc. ("RKO"), Twentieth Century Fox Film Corporation ("Fox"), and Warner Bros. Pictures, Inc. ("Warner Brothers"*) are engaged in all three activities. Defendant Columbia Pictures Corporation ("Columbia") produces and licenses pictures. Defendants United Artists Corporation and Universal Film Exchanges, Inc. ("United Artists" and "Universal") license pictures produced by others.

* Warner Brothers will apply to itself as producer, Vitagraph, Inc., a distributor-lessee, as well as to its subsidiaries, Stanley Company of America, an exhibitor, and Warner Bros. Circuit Management Corporation, which does the booking for Stanley.

[7] R. 489.

[8] R. 501, 511.

[9] The requirement here is to fit the inference facts into the framework of the primary facts in order to ascertain if there is to be a reversal or an affirmance.

[10] "First-run" is the first showing of a picture; later showings are called "subsequent-runs." The country is divided into districts. The best theatres are the first-run theatres. For the most part subsequent-run theatres are usually located in local communities or removed from the central part of a city. "Clearance" symbolizes the agreement of the producer or owner of a picture that he will not lease the picture for a subsequent-run in the same district until the expiration of a substantial period of time has elapsed after the picture has completed its first-run.

See Westway v. Twentieth Century Fox Film Corporation, D.C., 30 F.Supp. 830, 834–839 and White Bear Theatre Corporation v. State Theatre Corporation et al., 8 Cir., 129 F.2d 600, for a discussion of "runs" and "clearances." See the opinion of the Court below (54 F.Supp. 1011, 1012) for "block booking."

[11] The Warner Brothers theatres have substantially similar appointments and have seating capacities ranging from 1473 to 4387 persons.

[12] While the Court below did not specifically so find, the evidence is clear that plaintiff believed at the time it leased the Erlanger that it would be able to obtain the quality of pictures it desired from the distributor defendants. In fact, Para-

at 21st and Market Streets, one city block from Warner Brothers' Mastbaum Theatre, was available for leasing. The Erlanger has a seating capacity of 1859 persons. Its appointments are quite as elegant as any of those of the Warner theatres. As to management, reputation and in all other respects, the Court below found, the Erlanger was suitable for profitable exhibition of first-class feature motion pictures on first-run in competition with the theatres operated by Warner Brothers.[13] Plaintiff's 10 year lease of the Erlanger commenced on November 9, 1940, at an annual rental of $12,000. After leasing the Erlanger plaintiff made repeated requests to the distributor defendants to lease feature pictures for first-run exhibition upon offers to pay much higher prices for pictures than the distributors had been receiving from Warner Brothers. Plaintiff was able to offer such prices because of the favorable terms found in its lease. But, distributor defendants refused and still refuse to lease any of such pictures to plaintiff for first-run exhibition.

Plaintiff put interrogatories to the defendants in order to ascertain their reason for such uniform exclusion. Fox stated that its arrangement with Warner Brothers gave it "economic advantage." RKO and Loew's stated a similar arrangement was "more advantageous". Paramount said its agreement with Warner Brothers was "desirable," while Columbia put the arrangement on the basis it was "very satisfactory." Prior and during the time plaintiff attempted to obtain pictures for exhibition at the Erlanger, Warner Brothers controlled the Mastbaum Theatre which is, as observed above, located at 20th and Market Streets and one city block from the Erlanger. From 1929 to 1935 the Mastbaum was operated as a combined stage-show and motion picture theatre. It closed on March 3, 1935. Then, on September 4, 1942, Warner Brothers reopened it. Since its reopening, the receipts have amounted to approximately $1,-000,000 a year. The Court below found that since September, 1942, it has proved to be

one of the most successful of the Warner theatres operating in Philadelphia.[14] The Court below then found the distributor defendants had refused to lease pictures to plaintiff at the Erlanger theatre solely because that theatre was not under the control of Warner Brothers; but if it had been a Warner's theatre they would have leased plaintiff the pictures it sought. In addition, the Court below found that each and every distributor, as well as Vitagraph, knew every other distributor was leasing its feature pictures for first-run in Philadelphia to Warner Brothers to the exclusion of plaintiff. In order not to break the continuity of the exposition of the primary facts as found by the Court below, we merely and momentarily make one reference to a portion of the opinion below (54 F.Supp. at page 1015): "Of course, the intent is patent— necessarily inferable from the contracts themselves—to exclude the plaintiff and all others except Warner from the first run business."

The Court below concluded that defendants had not imposed nor intended to impose unreasonable restraint upon interstate commerce, but that the state of control exercised by defendants over their product constituted merely a monopoly in the "ordinary" and "popular" sense, and that such acts of control did not come within the prohibition of the anti-trust laws, because defendants' activities amounted, at best, to a "partial control of a given market."

Admittedly, all three phases of the motion picture business involved in the instant case—production, distribution and exhibition—constitute a part of interstate commerce. Unquestionably, no person can with profit operate a first-run theatre in Philadelphia without access to defendants' product. Defendants urge us to recognize the rule " 'long recognized' of a trader engaged in an entirely private business 'free to exercise his own independent discretion as to the parties with whom he will deal.' " That doctrine has deep roots in our past.

---

mount had informed plaintiff that it was dissatisfied with Warner Brothers' exhibition of its pictures and it was highly likely Paramount would lease to plaintiff instead of Warner Brothers if plaintiff acquired the Erlanger.

13 While the precise fact was not found by the Court below, plaintiff's inability to procure the feature pictures it desired was obviously not and could not be based on the fitness of plaintiff's theatre which had

never been used for subsequent-run pictures.

14 The Court below refused to find that the successful operation of the Mastbaum theatre by Warner Brothers was evidence that the public would have patronized from November 1940 plaintiff's Erlanger theatre for the exhibition of first-run pictures. We think there was ample evidence to support such a finding.

But like all postulates it has its limitations. Free trade between private parties is subject to the condition that a particular method of doing business must not run afoul of the federal anti-trust laws. We do not believe it our function to enter into the strife of the competitive markets to protect the unfortunate. Plaintiff, as the mere lessee of a theatre, has no right to demand defendants' products. But, plaintiff does have the right to have its business protected if there is concert of action directed at plaintiff, which results in its removal from competition.

 Combination which unreasonably limits competition which would otherwise exist between persons in similar businesses is illegal. A suppression of competition necessarily restrains commerce. Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, Ann.Cas.1918D, 1207. The purpose of the anti-trust laws— an intendment to secure equality of opportunity—is thwarted if group-power is utilized to eliminate a competitor who is equipped to compete. United States v. Socony-Vacuum Oil Co., 7 Cir., 105 F.2d 809, 825. In Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 45, 75 L.Ed. 145, it was said: "In order to establish violation of the Sherman Anti-Trust Act, it is not necessary to show that the challenged arrangement suppresses all competition between the parties * * *. The interest of the public in the preservation of competition is the primary consideration." The restraint of trade contemplated by the statute means restraint of competition. United States v. Eastern States Retail L.D. Ass'n, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788.

Warner Brothers, controlling all the theatres involved, enjoys monopoly not alone by the fact of ownership but also as a result of the concert of action of the distributors. It is here that the Court below arrived at two crucial findings: The first: "Each and every distributor defendant as well as Vitagraph, Inc., knew that every other distributor defendant was leasing its feature pictures for first run exhibition in Philadelphia at the theatres operated by the Stanley Company of America [Warners] to the exclusion of plaintiff"; the second: "The distributor defendants have refused to lease pictures for exhibition at the Erlanger theatre solely because that theatre was not under the control of Stanley Company of America, Inc., and if said theatre had been under the control of Stanley Company of America, Inc., the distributor defendants would have leased pictures for exhibition therein at all times since November 9, 1940."

 After critical re-examination of the whole record, we conclude that from plaintiff's evidence it has been shown that there existed an illegal intent to restrain. Plaintiff's evidence shows that there is concert of action in what has been done and that this concert could not possibly be sheer coincidence. We think there must have been some form of informal understanding. The axiom is ancient that the deed speaks for itself and that man intends the probable consequences of his act. Here, the conclusion is justified that defendants acted in concert in excluding plaintiff.[15] This conclusion is strengthened by the circumstance that defendants "with like unanimity, failed to tender the testimony, at their command, of any officer or agent of a distributor who knew, or was in a position to know, whether in fact an agreement had been reached among them for concerted action. When the proof supported, as we think it did, the inference of such concert, the burden rested on [defendants] of going forward with the evidence to explain away or contradict it. * * * The failure under the circumstances to call as witnesses those officers who did have authority to act for the distributors and who were in a position to know whether they had acted in pursuance of agreement is itself persuasive that their testimony, if given, would have been unfavorable. * * * Silence then becomes evidence of the most convincing character. * * * It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. * * * It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." Interstate Circuit v. United States, 306 U.S. 208, 225, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610.

 We conclude that where a person has an available theatre to exhibit first-run pictures in a city of some two millions

---

15 "The picture of conspiracy as a meeting by twilight of a trio of sinister persons with pointed hats close together belongs to a darker age." Temporary National Economic Committee, Monograph No. 16, p. 15.

of people, where such business draws receipts in the many more millions of dollars each year, where the public has a live interest in the recreation, education and informative services which this new art form furnishes,[16] a course of conduct, by those who own all of the other available theatres in that area, and those who distribute the product, which eliminates from competition the owner of the available theatre, constitutes a violation of the statutes. We reject the argument that, at most, if monopoly existed or exists it is limited to the downtown theatre district of Philadelphia and it amounts to partial control of the business of exhibiting motion pictures in a limited area. True, Warner Brothers operate only a small part of the total number of theatres within the municipal boundaries of Philadelphia and its environs. But, Warner Brothers own or control all of the theatres where first-run pictures are exhibited in the centralized theatre district of Philadelphia.[17] We are unaware of a rule of limitation, dependent upon operation in space, which permits an illegal monopoly and restraint of trade. The statutory prohibition is against any course of conduct which monopolizes "any part" of interstate trade. We know of no authority which sanctions what would otherwise be an illegal monopoly simply because it operates in a single city or a particular part of a city and affects only a part of an industry involved. There is no such limitation on the effect of the anti-trust laws. Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734; Indiana Farmer's Guide Pub. Co. v. Prairie F. P. Co., 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356; Oxford Varnish Corp. v. Ault & Wiborg Corp., 6 Cir., 83 F.2d 764; Peto v. Howell, 7 Cir., 101 F.2d 353; Truck Drivers' Local No. 421 v. United States, 8 Cir., 128 F.2d 227; White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 129 F.2d 600; Louisiana Farmers'

Protective Union v. Great A. & P. Tea Co., 8 Cir., 131 F.2d 419; Bigelow v. Calamet & Hecla Mining Co., 6 Cir., 167 F. 704. Neither can there be a basis for the proposition that a first-run picture is not an article of trade or commerce. If the proposition were sound, Warner Brothers and the distributors could never, under any circumstances, be charged with violation of the anti-trust laws in dealing in first-run pictures. There is nothing vague about the quality of the product. That product as it affects plaintiff's business is as real as if the defendant distributors had combined to remove Warner Brothers as an exhibitor in the City of Philadelphia. To say that if this should come to pass Warners would be helpless to call the statutes into operation is to say that the business of producing, distributing and exhibiting first-run pictures is not a "part of the trade or commerce within the States" as that phrase is found in the Act. When the control of the product is accompanied by an intent to monopolize and there results a restraint on interstate trade by the elimination of a smaller competitor, then we think there does exist an unreasonable restraint within the meaning of the statutes.

■ When plaintiff leased the Erlanger it knew, defendants argue, that the distributors had licensed their product to Warner Brothers and there was no way plaintiff could get that product unless the distributors violated their agreements with Warners. Those contracts were never intended to be in perpetuity. It is their legal validity when placed in juxtaposition to the Sherman and Clayton Acts which is challenged. If they were instruments utilized in violation of the statutes, they have no sanctity; except between the parties to them.

■ The sum of this case results from the addition of definite facts. Plaintiff is qualified to operate a first-run motion picture theatre in Philadelphia. Defendants control the production and distribution of more than 80% of feature pictures in this

---

[16] "But bonds of union exclude the newcomer, impose vassalage upon the independent exhibitor, and deny to a modern art adequate opportunity for expression." TNEC, Mon. No. 16, p. 19.

[17] Under its agreements with distributor defendants, Warner Brothers not only has exclusive first-run in Philadelphia but also in the contiguous territory, i.e., Delaware, Chester, Montgomery and Bucks Counties in Pennsylvania; Camden, Gloucester, Burlington, Cumberland and Atlantic (except Atlantic City) Counties in New Jersey. Some of the agreements include the "entire state of Delaware," which means, for example, that no person in the state of Delaware is permitted to enjoy a Fox production until after it has finished its run at a Warner Brothers theatre in Philadelphia. We are not to be understood as condemning "clearances." The reference is made simply to show the significance of first-run pictures in and around Philadelphia.

country, and no exhibitor can successfully operate without access to defendants' product. Plaintiff asked for the product. He was refused. If its Erlanger theatre had been owned or controlled by Warner Brothers a part of defendants' product would have been exhibited at the Erlanger. Uniform participation by competitors in a particular system of doing business where each is aware of the other's activities, the effect of which is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the statutes before us. In the case at bar it is necessary to conclude that plaintiff has sustained its charges, as each of the distributor defendants knew that its refusal to lease pictures to plaintiff, together with the refusal of all, would result in the creation of an illegal monopoly in the business of exhibiting first-run pictures in Philadelphia by Warner Brothers; that Warner Brothers have attempted to and are monopolizing such business; that distributor defendants have aided Warner Brothers to monopolize; and that the monopoly is only made possible by the cooperation between Warner Brothers and the distributors.

As the trial court also found, plaintiff has unquestionably suffered loss. We have no means of knowing the extent of that loss. Perhaps, upon remand plaintiff may be able to prove its damages; or, the factors to be considered may be subject to so many unknowns that such damages may veer toward the speculative. We specifically pass no opinion on these problems. We do conclude, however, plaintiff should have judgment and the injunctive relief which it originally sought. The form of decree we leave to the Court below after it has made inquiry into the damages question.

Reversed.