UNITED STATES of America, Plaintiff,

v.

CBS INC., Defendant.

UNITED STATES of America, Plaintiff,

v.

AMERICAN BROADCASTING COMPANIES, INC., Defendant.

Civ. Nos. 74–3599–RJK, 74–3600–RJK.

United States District Court,
C. D. California.

Oct. 25, 1978.

Bernard M. Hollander, Harry G. Sklarsky, Barry J. Kaplan, Bernard J. O'Reilly, Kevin R. Sullivan, George W. Selby, Jr., Ruth Dicker, Joseph T. Maioriello, Robert J. Rose, Los Angeles, Antitrust Div. Dept. of Justice, Washington, D. C., for plaintiff.

Robert S. Rifkind, Eugene P. Souther, New York City, John G. Niles, Los Angeles, Cal., Lloyd N. Cutler, Washington, D. C., Cravath, Swaine & Moore, New York City, Wilmer, Cutler & Pickering, Washington, D. C., Seward & Kissel, New York City, and O'Melveny & Myers, Los Angeles, Cal., for defendant CBS Inc.

Daniel H. Margolis, James R. Loftis, III, Washington, D. C., Anthony E. Liebig, Los Angeles, Cal., Bergson, Borkland, Margolis & Adler, Washington, D. C., Lillick, McHose & Charles, Los Angeles, Cal., for defendant ABC.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, District Judge.

These cases, sadly, continue to crawl in their own labyrinthine fashion towards trial. Presently before the Court are defendants' motions to dismiss certain government allegations. As will develop, these motions are granted in part and denied in part. However, it is the Court's intention in preparing this Memorandum of Decision and Order to accomplish more than setting forth statements of the applicable law and its conclusions thereunder. In addition, the Court views—and expects the parties to view—this effort as a blueprint for the remaining pretrial stages of these cases. Following this Order, the government will not be required to further define its allegations: they are sufficiently concrete to enable defendants to proceed, in a rational manner, with their discovery. Simultaneously, the Court expects, as the parties themselves have stated, that there will be no further disputes regarding the nature or scope of permissible discovery in the wake of this Order. The Court expects such discovery to proceed smoothly and swiftly. With these thoughts in mind, the Court turns to the substantive matters before it.

*Defendants' Motions to Dismiss*

Defendants move to dismiss the government's allegations of monopolization and non-per se (*i. e.* unreasonable) restraints. They claim that the government's memorandum and recital of evidence shows that ABC, CBS and NBC compete *inter se* for the purchase of prime time television programs and talent. In defendants' words,

[p]laintiff's concessions and proofs . . . simply disclaim any combination or restraint of trade in a three-network market, under either sections 1 or 2 of the Sherman Act. While plaintiff may be genuine in its concern that CBS and ABC independently obtain contract terms favorable to themselves and unfavorable to producers . . . ., the antitrust laws are simply not intended as a mechanism for redressing supposed imbalances of bargaining power between buyers and sellers.

Defendants also state that "CBS, ABC and NBC compete in the purchase of television entertainment programs; . these companies are in the same relevant market; and hence, the charges in the Complaint cannot be made out." Finally, defendants maintain that the government's definition and recital of evidence regarding the relevant market is insufficient.

 At the outset, the motion before the Court is procedurally inapposite. However, as with other devices utilized to terminate complex litigation prior to trial, the Court should be governed by the general principle that pretrial dismissals are highly disfavored, and will only be handed down with extreme prudence and caution. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). All inferences must, and will be, drawn against the moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

### A. *The Monopolization Allegations*

The Court's June 20, 1978 order required the government to set forth detailed defini-

tions and a more particularized recital of its proposed proofs regarding the relevant markets with respect to its monopolization (i. e. Section 2) charges. The government's moving papers, and its statements in open court, show that the government alleges that defendant CBS and defendant ABC monopolize, in violation of Section 2 of the Sherman Act, two separate and distinct relevant markets. First, the government alleges that defendant CBS monopolizes "[t]he relevant market composed of national commercial television network prime time entertainment programs." The government similarly alleges that defendant ABC simultaneously monopolizes that same market. Second, the government alleges that defendant CBS monopolizes "[t]he relevant submarket composed of CBS television network prime time entertainment programs." The government further alleges that defendant ABC monopolizes "[t]he relevant submarket composed of ABC television network prime time entertainment programs." The issues, then, with respect to this portion of defendants' motion to dismiss, are (1) whether the market definitions offered by the government are sufficient in law to support its Section 2 allegations, and (2) whether the government's recitals of its evidence are sufficient, at this stage of the proceeding, to support its several Section 2 allegations.

The Court's June 20, 1978 order focused on the need to define and substantiate allegations of a relevant market in the context of a Section 2 charge. As the commentator Richard Posner observes

> [w]ith antitrust legality . . . so dependent on ascertaining the number of rivals, the definition of the market—the set of sellers [or buyers] that will be included in the count—becomes crucial.

R. Posner, *Economic Analysis of Law* 221 (2d ed. 1977). *See also United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The parties and the Court examine, at this stage, the ambit of the relevant *product* market. The Court will first examine the government's monopolization allegations with respect to the "national commercial television network prime time entertainment program" market [hereinafter referred to as "the Primary Market"]. The Court will then consider the government's allegations and recitals with respect to the submarkets composed of, respectively, CBS and ABC "television network prime time entertainment programs" [hereinafter referred to as "the Submarkets"].

1. *Monopolization of the Primary Market*

The government alleges that ABC and CBS each monopolize the relevant primary market, that is, "[t]he relevant market composed of national commercial television network prime time entertainment programs." Although the government's attorneys have been obscure, to say the least, in their moving papers and in oral argument, the Court understands the government to argue that the market structure of the commercial television industry results in defendants ABC and CBS receiving a fixed "block" of prime time air space, to which each enjoys exclusive access. Each defendant appropriates to its own exclusive use its block of prime time, denying access to others (including other networks and independent producers). Because the substantial size of each defendant's share of the prime time market (*i. e.,* about 33 percent) is coupled with other, special, but unfortunately unalleged and undefined, features, the government feels that a Section 2 cause of action will lie against the defendants, individually, in the primary market. The government, in papers filed with this Court and in oral argument, has been incapable of so much as articulating these "special" features. The Court has sought to divine them from the pleadings, and the government's recitals of evidence. The Court concludes that this particular allegation must be dismissed: the law simply does not support the government's Section 2 allegations with respect to the primary market.

 To begin, market share, although far and away the most important factor in determining the presence or absence of the monopoly power condemned by Section 2 of the Sherman Act, *does not alone determine*

the presence of that proscribed power. *See Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196 (9th Cir. 1975), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). However, monopoly power is ordinarily inferred from a predominant share of the market, because size is the accepted hallmark of monopoly power. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264 (9th Cir. 1975). And the Court is mindful, in reaching its decision, of the statement of the late Judge Learned Hand in the *Alcoa* opinion:

> That percentage [*i. e.* over ninety] is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four per cent would be enough; and *certainly thirty-three percent is not.*

*United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir. 1945) (emphasis added). Importantly, the Second Circuit Court of Appeals was, in the *Alcoa* case, sitting as the Supreme Court of the United States. *See United States v. Aluminum Co. of America, supra,* at 421. The above-noted statement of Judge Hand thus is seen, by this Court, as more than merely persuasive authority.

Here defendants each possess 33 percent of the relevant market. The government alleges no collusion, express or tacit, between them. Hence, the issue, as the Court sees it, is whether special circumstances exist sufficient to enable the government to proceed with its Section 2 case in the primary market.

Market shares of less than 50 percent may be sufficient to give rise to monopoly power. A market share that fluctuated from 45 to 70 percent of the relevant market was sufficient in *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc., supra.* There, however, the Ninth Circuit found two special factors. First, the Court noted that defendant's competitors were "relatively small, with no single competitor controlling over 18% of the market before, or 12% of the market after, [defendant's] entry." *Id.* at 1204. Second, defendant's control over one market gave it monopoly power in the relevant market. *Id.* Nonetheless, the Ninth Circuit has intimated that a finding of monopoly power with a showing of less than 50 percent of the relevant market will be subject to close, indeed skeptical, scrutiny. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co., supra,* at 1274.

In the instant case, the individual defendant's competitors are the other networks. Each competitor—and each individual defendant—controls approximately 33 percent of the relevant primary market. It cannot be said that each of defendant's competitors is "relatively small." Nor has the government shown, in its pleading or in its recital of evidence required by order of the Court, or in oral argument, the alleged presence of any other factors sufficient to give each individual defendant monopoly power in the relevant primary market. The government has, in fact, been obscure to the point of evasion with respect to each individual defendant's Section 2 liability in the primary market. In an effort to aid the Court in refining the issues and to enable defense counsel to fashion their response and discovery, the Court ordered the government to set forth in refining the issues its claims with respect to the relevant market with some particularity. The government has not done so, for the obvious reason that it cannot do so.

Because possession of monopoly power in the relevant market is essential to Section 2 liability, *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), the Court dismisses the Section 2 charge with respect, and only with respect to, the so-called "relevant primary market."

## 2. The Submarkets

It has long been recognized that "there may be an outer market and one or more inner submarkets within which competitive effects are to be appraised, *i. e.,* a relevant submarket may constitute the product market for antitrust purposes." *Case-Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449, 454 (9th Cir. 1966), *rev'd on other grounds,*

389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967) (applicability of Capper-Volstead Act). Indeed, since the mid-1930's, the federal courts have recognized that

> [n]either the Sherman Antitrust Act nor the Clayton Act defines "monopoly," and neither charts the field with respect to which a given practice may be adjudged monopolistic, or be deemed to lessen competition. The patent law recognizes limited monopoly, often in an extremely narrow and restricted field. Manifestly there may be monopoly of a defined subdivision of an industry, as of the industry itself.

*Oxford Varnish Corp. v. Ault & Wiborg Corp.*, 83 F.2d 764, 766 (6th Cir. 1936). The problem is whether submarkets exist, for the purposes of antitrust law, containing, respectively, only CBS or ABC prime time television entertainment programs.

■ The ancient formula for determining the relevant market, set forth in *du Pont* (Cellophane), *supra,* was interchangeability of products. However, the reasonable interchangeability test "has been refined and modified in subsequent cases." *Case-Swayne, supra,* at 454. Interchangeability is not and should not be the sole test because

> [a] monopolist always sells in the elastic region of his demand schedule. . . . [O]ne reason that most demand schedules have an elastic region is that the higher the price of a product, the more attractive substitute products become to the consumer. Hence it is not surprising to find a high cross-elasticity of demand between a monopolized product and other products at the monopoly price-output level, meaning that at that level the demand for the substitute products is highly responsive to a change in the price of the monopolized product.

*R. Posner, supra,* at 222. Thus, in determining the parameters of relevant submarkets for antitrust purposes, several other factors have been brought into play. The Ninth Circuit, for instance, has held that any submarket for antitrust purposes "must correspond to the commercial reali-

ties of the industry . . .." *Case-Swayne, supra,* at 456. The submarkets must be "sufficiently distinct in commercial reality to permit a company that dominated these submarkets to exclude competition and control prices." *Greyhound Computer v. International Business Machines, Inc.,* 559 F.2d 488, 493 (9th Cir. 1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). As the *Greyhound* Court added, "[t]his depends upon whether efforts to exclude competition or control prices in the submarkets in question would be negated by a shift of buyers to other portions of the market." *Id.*

■ Given the law to this point, a further issue arises as to whether an antitrust defendant can be found to be monopolizing a submarket consisting entirely of its own products. The Ninth Circuit has not squarely confronted this problem. However, the issue was raised in the *Greyhound* case, *supra.* There, the Ninth Circuit stated

> [w]e need not decide whether IBM's product line constitutes a separate submarket for antitrust purposes. . . . Greyhound asserts that by offering a complete product line of general purpose commercial systems, IBM is able to "lock in" users who select IBM equipment initially, and limit competition to leasing companies carrying IBM systems. We intimate no view on *whether such evidence establishes* an economically distinct submarket.

*Id.* at 495–6 (emphasis added). Note, however, that the Ninth Circuit saw the issue as one of *evidence,* not of *law,* indicating that the Ninth Circuit finds no *legal* difficulty with the proposition that one could monopolize a submarket consisting entirely of one's own products. To the same effect are *Bushie v. Stenocord Corp.,* 460 F.2d 116 (9th Cir. 1972) and *Industrial Building Materials v. Interchemical Corp.,* 437 F.2d 1336 (9th Cir. 1970). For instance, in the *Industrial Building Materials* case, although the Court was skeptical of such a claim, it went on to observe that

> [a] full development of the facts might possibly present such a unique position, especially if that position were acquired

by means that show an intent to monopolize the industry, that the court would be justified in finding that a particular manufacturer's line of products is a relevant market.

*Industrial Building Materials, supra,* at 1344. In summary, a relevant submarket in one's own products will exist if such a submarket is (a) sufficiently distinct in commercial reality, and (b) is relatively immune from competition of substitutes, or (c) was acquired by means that show an attempt to monopolize.

■ Although the defendants hint that it is otherwise, the government's allegations and evidence show that the three predominant buyers of prime time television entertainment programs are the three networks. Because the three possess approximately equal shares of prime time airspace (*i. e.* 33 percent), they cannot be accused of monopolizing the "primary" market, at least in the absence of some kind of "shared monopoly" allegation, a theory expressly rejected by government counsel in oral argument. See Part A.1. of this Memorandum of Decision and Order. However, because there are but three dominant buyers in the relevant primary market, that is, in technical terms, an oligopsony (i. e., many sellers, few buyers), the answer may be different in the submarket. One feature of an oligopsony is that

> with highly concentrated buying, patterns of tacit collusion implemented by buying price leadership by the largest buyer are frequently in evidence. *If not,* close interdependence in the buying price policies of the principal buyers is found.

*J. Bain, Industrial Organization* 367 (2d ed. 1968) (emphasis added). This close interdependence, coupled with the networks' market power generated by their FCC licenses and contracts with affiliate stations, forms the basis for the government's monopolization theory.

The close interdependence alleged by the government between ABC, CBS and NBC in their purchasing policies means that although the networks compete, to some extent, in the primary market, the terms and conditions of their purchasing contracts are strikingly similar. All contracts control and appropriate the "downstream" activities of a unique prime time entertainment idea. Further, contracts with producers bind them, in the future, with respect to new ideas. Thus, though there may be competition to some extent, in the primary market, at time ONE, the contracts and the market power of the networks create the very submarkets the government complains of at times TWO or THREE (*e. g.,* network control of spinoffs, foreign distribution, etc.).

The best understanding of the government's submarket theory comes by analogy. To be sure, automobile manufacturers compete with one another to sell "new cars." That market is, as they say, competitive. However, if General Motors required every purchaser of a "new" automobile to resell that car to GM at a specified price at a specified time, it might logically be said that GM is attempting to monopolize the market for "used" GM automobiles. Similarly, the networks are seen in the government's complaint under Section 2 as monopolizing the markets for "used" ABC or CBS prime time television entertainment programs. On an abstract level, products exist both in space and in time: that defendants' products compete at time ONE does not foreclose a charge that one of them monopolizes a separate, distinct submarket at time TWO.

This is not a unique theory. For instance, in *United States v. General Motors Corp.,* 121 F.2d 376 (7th Cir.), *cert. denied,* 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497 (1941), "the government . . . successfully proceeded on the basis that all three leading firms in the 'oligopolistic' automobile industry could separately be held at variance with the Sherman Act in tying the business of financing car sales to that of selling the cars. Each of the three, in other words, was regarded as restraining trade *in its own section of the market . . . .*" *A. Neale, The Antitrust Laws of the U.S.A.* 158 (N.I.E.S.R. Students' ed. 1970). Similarly, the *Alcoa* case, *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.

1945), itself a Section 2 case, implicitly stands for the proposition that the same physical product (aluminum ingot) can be, at different times, in different markets. *See also William Goldman Theatres, Inc. v. Loew's, Inc.,* 150 F.2d 738 (3d Cir. 1945) ("first run" movies are in a different market than other films, although over time "first run" films eventually become "second" run movies and, as such, enter a different relevant market).

Defendants make much of the fact that the Ninth Circuit cases state that where a primary market exists in widgets, there cannot simultaneously exist a submarket in certain specific kinds of widgets. As the above analysis demonstrates, however, these cases are simply inapposite. To be sure, at the time of the initial purchase, there could be no primary market for network prime time television entertainment programs and, at the same time, a viable submarket in *network* prime time television entertainment *comedy* shows. However, to take but one example, a prime time show and a prime time show being rerun are not birds of the same feather: they comprise different markets, or submarkets.

■ Finally, defendants vigorously note that the government alleges no anticompetitive activity in the "primary" market. In fact, the government by its recitals and memorandum admits that ABC, CBS and NBC compete with each other for the initial acquisition of programs and talent. Defendants make much of this admission. If the networks compete, they say, defendants cannot be found guilty of monopolizing the primary market. That is true, as far as it goes, but the government's attack here focuses on monopolization of the *submarkets.* For these reasons, defendants' motion to dismiss the government's submarket Section 2 allegations is denied.

### 3. *Sufficiency of the Recitals*

The government's recital of its evidence would be more than sufficient, if adduced at trial, to enable a jury to reasonably find against the defendants on a Section 2 charge, at least on the issue of the existence of a viable submarket composed only of CBS (or ABC) prime time television network entertainment programs.

In summary, the government maintains that "CBS television entertainment programs are not reasonably interchangeable with programs considered by ABC and NBC, because CBS insulates itself from competition from the other two national . . . networks by imposing an elaborate structure of contractual restraints on independent television program producers and others. These contractual restraints create a separate and distinct submarket, . . . .. Proof . . . will include evidence of contractual restraints on the interchangeability of programs among the networks and the monopsonistic effects of those restraints."

Specifically, the government proposes to offer evidence that CBS refuses to consider independently produced series unless it also receives options to develop the idea into a pilot, and then into a series which is pre-ordered annually at pre-set prices. Further, the government recites evidence that CBS requires the producer to grant extra option years in return for renegotiating license fees and other terms of the initial buying arrangement. Rights of first refusal and first negotiation are also seen as contributing to the insulation of CBS prime time television entertainment programs. Exclusive rights to spin-offs are recited as are restrictive talent agreements. The monopolistic effects of CBS's contractual restraints are supported by evidentiary recitals of its pricing and buying policies for independently produced shows. Similar detailed evidence is recited with respect to the ABC complaint.

Again, it is to be remembered that the Court's June 20 order merely required definition and an adequate recital of evidence, sufficient to show that the government could proceed with its Section 2 theory. The government has met its burden here.

### B. *Unreasonable Restraints: Section 1*

The Court's June 20 Order also required proof (via recitals), and a definition of the

relevant market with respect to the government's rule of reason Section 1 claims. The government's memorandum indicates that anticompetitive activity arises in *both* the primary market and the submarkets. Defendants object here to the government's "switching its position" at this late hour. Defendants state that the government's recent addition of the primary market as an additional situs of anticompetitive conduct prejudices them, and requires dismissal of the non-per se counts, at least with respect to the primary market.

Defendants' objections are not without their force. It appears to the Court that the government focused heavily on the submarkets prior to these motions. But defendants have been on notice of the existence and scope of the government's Section 1 claims, if for no other reason than the definitional fact that anticompetitive conduct occurring within a submarket also occurs in the larger, primary market of which it is a subset. The Court concludes that the government's definition of and recital of evidence concerning the relevant markets in the context of its non-per se claims is sufficient, and hence in compliance with its June 20 order.

### C. *Summary*

■ The Court will also take this opportunity to summarize its understanding of the government's remaining causes of action against the defendants. In addition to its allegations of monopolization in violation of Section 2, and rule of reason violations of Section 1 of the Sherman Act, the defendants are further accused of attempting to monopolize, or combining to monopolize, in violation of Section 2 of the Sherman Act. The government also charges defendants with "per se" violations of Section 1. *See* the Court's Memorandum of Decision and Order of June 20, 1978. The Court is satisfied that the government has alleged sufficient facts upon which relief could be granted as to all these theories, and will entertain no further motions to dismiss at this pre-trial stage.

In addition, the Court took under submission the government's motion to quash subpoenas duces tecum issued by defendants in this case. The Court does not here rule on that motion. However, it is the Court's understanding, based on representations made by counsel for both sides at oral arguments on these motions, that discovery will proceed apace pending resolution of the government's motion to quash. This will be achieved by deposing witnesses without benefit of any documents that may be subsequently unearthed in the discovery process. The government, or defendants, will then have the chance to recall certain witnesses when, and if, any documentary evidence surfaces that has a bearing on their former testimony.

The Court wishes to remind counsel for the government, and counsel for the defendants, that the Court's December 31, 1978 discovery cut-off date remains in full force and effect. The Court intends to retain this December 31, 1978 discovery cut-off date with respect to the oral depositions, and so indicates to the parties at this time. This, of course, in no way intimates that the Court will later modify its December 31, 1978 cut-off date with respect to documentary discovery. Counsel for both sides are ordered to proceed with the depositions of all witnesses. No deposition is to be deterred or deferred pending production of documents, with the understanding that perhaps some depositions will have to be reopened in part after documents, if any, are produced. The Court observes that there is a great area in this case where complete and effective depositions can be taken without any documents from third parties. These depositions are to be completed no later than December 31, 1978. No depositions will be allowed beyond this date without prior leave of Court.

### D. *Conclusion*

In summary, defendants' motion to dismiss the government's Section 2 claim in the primary market is granted. All other defendants' motions to dismiss are denied.

The Clerk of the Court shall send, by United States mail, a copy of this Memorandum of Decision and Order to counsel for the parties.