**THEATRE ENTERPRISES, Inc. v. PARA-MOUNT FILM DISTRIBUTING CORP. et al.**

No. 6512.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 21, 1952.

Decided Jan. 5, 1953.

Edwin P. Rome, Philadelphia, Pa. (Sol C. Berenholtz, Baltimore, Md., and Gray, Anderson, Schaffer & Rome, Philadelphia, Pa., on brief), for appellant.

J. Cookman Boyd, Jr., and R. Dorsey Watkins, Baltimore, Md. (Edward C. Raftery, New York City, and E. Compton Timberlake, Denver, Colo., on brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This action was brought under the antitrust laws[1] by Theatre Enterprises, Inc.,

---

1. 15 U.S.C.A. §§ 1, 2, 13, 15 and 16.

a Maryland corporation, against the eight largest motion picture producing and distributing companies in the United States. The plaintiff sought injunctive relief as well as monetary damages for loss suffered as a result of the defendants' refusal to supply first-run motion pictures to the plaintiff's theater in the City of Baltimore pursuant to an alleged conspiracy during the period from February, 1949 to March, 1950. The suit was originally instituted in the District Court for the Eastern District of Pennsylvania but on motion of the defendants, under § 1404(a) of the Judicial Code, 28 U.S.C.A., the case was transferred to the District of Maryland. The case came on for trial before a jury in the latter District and resulted in a verdict for all of the defendants; and the plaintiff appealed contending that the trial judge erred in denying plaintiff's motion for a directed verdict in its favor and in giving certain instructions to the jury.

At the conclusion of all of the evidence the plaintiff prayed the court to instruct the jury that they must return a verdict for the plaintiff in such an amount as they estimated the plaintiff's loss to have been. In other words, the court was asked to instruct the jury that the plaintiff had proved its case against the defendants and that the only question for their decision was the amount of the damages which the plaintiff had suffered. In order to pass on the refusal of this instruction the evidence submitted to the court must be summarized. The task is the easier because the facts presented by Harry D. Myerberg, the president of the plaintiff corporation and its only witness, and by the witnesses for the defendants are largely undisputed, and the decision turns on the question whether the only reasonable inference from the facts is that the defendants, in violation of the law, conspired to deny the plaintiff the rights to which it was entitled in the operation of its business.

The testimony on behalf of the plaintiff was to the following effect: For many years the showing in Baltimore of first-run motion pictures produced by the defendant companies had been confined to eight theaters located in the downtown section of Baltimore as follows: The Century and the Valencia, with seating capacity of 3,000 and 1600–1800 respectively, are both owned by Loew's. They have exhibited all of Loew's product, half of Universal's and some of United Artists'. The Stanley, seating 3,200, is owned by Warner's Circuit Management Corporation and exhibits all of Warner's films and one-half of Paramount's. In the 1920s Warner exhibited first-run exclusively at the Metropolitan, two and a half miles from downtown. Keith's, an independent, has played half of Universal's output, half of Paramount's, and "whatever else is available." Seating capacity is 2200–2400. The New, seating 1300, is another independent and exhibits Fox films exclusively. The Hippodrome, seating 1800–2000, was also independently owned and exhibited RKO and Columbia films. The Town was opened in 1949 by the owner of the Hippodrome and split RKO and Columbia films with the Hippodrome. The Mayfair, independent, seating 1800, is situated next to the Stanley, but unable to obtain a continuous flow of films from defendant companies, getting "slough" and films of the smaller companies.

The Crest Theatre was built at a cost of $460,000 by Theatre Enterprises, Inc., a corporation whose entire stock is owned by Myerberg and his brothers. It was completed in February, 1949. It is equipped with the most modern improvements and with 1600 seats, and is physically suitable to play first-run pictures, and if located downtown, probably would have been acceptable for the preferred showings. It is situated in a shopping center at Reisterstown Road and Rogers Avenue, six miles from the nearest downtown theater, in the midst of a population center estimated at about 105,000 people.

In January, 1948, before construction of the Crest had begun, Myerberg applied for exclusive first-run privileges at the offices of the defendant distributors in Washington, D. C. He was told by all of them that no consideration could be given to his request until the theater was near completion. When the theater was under roof in October, 1948, Myerberg renewed his request and was told that the matter had to be decided by the New York home offices of defendants, and that he should set forth

his requests by letter, which would then be referred to New York for decision. He wrote substantially identical letters requesting first-run to each defendant, except perhaps Columbia, which was approached subsequently.

Warner and Loew's advised Myerberg that each of them operated a first-run house in Baltimore, and that he should not anticipate receiving their product. The branch managers of all of the companies expressed surprise that Myerberg sought first-run outside the downtown area, contrary to the general practice of the industry. Myerberg engaged in further correspondence with defendants from October, 1948 until the theatre opened on February 26, 1949, and was "stalled" by one company and two others did not reply. He was able to see top officials of only three of defendants, and all of his efforts resulted in rejection of his request for first-run.

During the negotiations plaintiff made specific offers to various defendants for particular first-runs, and in all but one case the offer included a substantial guarantee of film rental and a percentage of the gross receipts, and plaintiff offered to post certified checks. None of the offers was accepted and in some instances plaintiff received no reply.

Plaintiff persisted in its efforts to induce defendants to grant it first-run after the Crest opened, and when this proved fruitless, plaintiff engaged present counsel who entered into six more months' futile correspondence and then brought this suit.

Plaintiff at first urged that it was not in substantial competition with the downtown theaters, and therefore was willing to take first-run on a day and date basis, that is, simultaneous showing with downtown and other non-competing suburban houses. Defendants contended that the Crest was in substantial competition with the downtown theaters, and plaintiff therefore expressed willingness to bid competitively for exclusive first-runs. Plaintiff denied claiming any superior rights over other comparable neighborhood theaters sufficiently far from downtown Baltimore and from each other as not to be in substantial competition with either downtown or each other, and was willing to play with them first-run day and date. Plaintiff pointed to the Northwood, Boulevard, Senator and Edmondson Village as theaters entering into such a scheme.

Defendants uniformly denied plaintiff first-run and uniformly granted it first-subsequent-run. They each gave the same basic reasons for their action, principally that each had a policy which limited showing of first-run films throughout the country to theaters in the downtown areas of large cities, and theaters outside those sections were therefore precluded from the preferred run.

Defendants' executives testified that the movie business has developed in such a manner as the result of heavier downtown traffic and more numerous downtown attractions to draw greater crowds, particularly for matinees. The defendants were primarily interested in obtaining the largest revenue possible from the exhibition of their pictures, and they said that downtown showings have greater exploitation and advertising value and that the downtown theaters may be properly called "show-case" theaters. In addition downtown theaters have been satisfactory customers of long standing.

Defendants further claimed that if they gave first-run to the Crest, they would lose their downtown customers as well as other subsequent-run customers. They declared that the Crest could not be successful with first-run and that they would not experiment with it. They further stated that the Crest could not be preferred to other similar neighborhood houses and if they should all be granted multiple first-runs the downtown theaters would be eliminated.

The unsuccessful efforts of the plaintiff to secure first-run pictures for its theater and the testimony of the defendants' witnesses indicate clearly in the plaintiff's opinion the existence of a nationwide policy, to which each defendant company adheres, that first-run pictures should be shown only in theaters in downtown sections of cities. Thereby the pictures are exploited and later they are made available to all sections of the city and all classes of people by the reduction of admission prices at later showings.

In six instances set out in the testimony exceptions to this policy have been allowed. Thus in Washington, D. C., and in Wichita, Kansas, an exhibitor which had been giving a first-run privilege to its own theater remote from the center of the city thereafter granted a similar privilege to an independent theater to avoid the charge of discrimination; and in Kansas City, Denver, Boston and Los Angeles exceptions have been made by exhibitors to their own theaters distant from the center of the city. These exceptions have not been attended by the disastrous result envisaged by those who established the general policy.

Loew's, Warner, Paramount, RKO and Fox, sometimes referred to as the "big five", owned hundreds of theaters in the United States. Many exhibited first-run, almost all of them downtown. All of the defendants exhibited their films in theaters owned by the five theater-owning defendants, and there was cross-licensing among them. Defendants produce most of the desirable films in the United States.

In addition to the more general "business reasons," Warner opposed the Crest's request because it would destroy Warner's Stanley and all other downtown houses, and would mean the elimination of downtown theaters, of which Warner owned many among its 400 odd houses throughout the country. Loew's likewise opposed the Crest because it would compete with the Century and the resulting spread of neighborhood first-run would curtail revenue from the exhibition of its pictures in downtown first-run houses operated by Fox, Warner, RKO and Paramount in other parts of the country.

Each defendant was aware of the downtown policy of the others and of the theater ownership of the "big five" mostly downtown, and of the system of cross-licensing. Paramount's representative knew that the other companies were going to sell the Crest Theatre on a 21 day availability before that house opened. Fox's manager found that no downtown theater in Baltimore was willing to play first-run day and date with the Crest Theatre and decided to do what every-

one else was doing. There has been frequent interchange of top sales and distribution personnel among the various defendants.

The effect of the defendants' policy has prevented the plaintiff from competing in the first-run portion of the movie industry.

In accordance with § 5 of the Clayton Act, 15 U.S.C.A. § 16, the plaintiff, in addition to the testimony above set out, offered in evidence the pertinent portions of certain decrees issued by the court against the same defendants in United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260,[2] in order to show that the defendants, prior to the opening of the Crest Theatre, had conspired with one another in restraint of trade in the moving picture industry in violation of the statutes on which the instant suit is based.

The defendants offered 19 witnesses whose testimony may be summarized as follows: It was explained that "run and clearance" are a well established and essential part of the distribution and exhibition of motion pictures. Indeed Myerberg himself stated during his testimony that "runs and clearances, basically, are all right." Each of the defendant distributors licenses each of its pictures for exclusive first-run in a theater in the downtown shopping area in Baltimore and normally the first-run exhibitor is given a clearance of 21 days over the next succeeding run called the "first-neighborhood-run." No such first-run was shown ever to have occurred in Baltimore. During the three years preceding the institution of the suit, 63 per cent of the first-run exhibitions in Baltimore were held in independent theaters. Myerberg agreed that there was no showing that any of the defendants conspired with the independent downtown exhibitors or with any of the neighborhood exhibitors.

The Crest Theatre is located in the northwest quadrant of Baltimore within a mile of two other neighborhood theaters one of which is comparable to the Crest in all material respects except size; and there are numerous other theaters in the city which

2. See also D.C.N.Y., 66 F.Supp. 323; Id., 70 F.Supp. 53; Id., 85 F.Supp. 881.

are equal or superior to the Crest in appointments and size, many of which are better located than the Crest in respect to public transportation services. Expert testimony placed shopping centers in three classifications, namely, primary centers which have 60 to 150 different stores with one large and several smaller department stores with a drawing power of 50 miles, such as the downtown retail business area in Baltimore; secondly, centers with 20 to 50 stores and at least one department store, of which there are half a dozen in Baltimore, and thirdly, neighborhood shopping centers with not more than 15 stores and no department stores. The Crest Theatre is located in a center of the last mentioned class.

Myerberg conferred with seven of the eight defendants in Washington, D. C., in October, 1948, and about October 12, 1948, sent to all the distributing companies, except Columbia, a letter requesting an outstanding film to open the theater, preferably a "world premiere."

Myerberg had further conferences with the distributors during October, November and December, 1948. At first he requested exclusive first-run, assuming substantial competition with the downtown houses, and later he requested simultaneous run on the ground of no substantial competition.

United Artists told him that all its immediate releases were already sold, and did not reply to his letters. Warner said that it had its own theater and therefore would not license first-run to plaintiff. RKO said "no" after Myerberg spoke with a top official in New York. Loew's, like Warner, said that it exhibited in its own theater. Universal rejected the request after its district manager came to Baltimore to examine the Crest, and concluded that the theater was badly located, even for a neighborhood, and that the area was already adequately served and overseated. Fox rejected plaintiff's offer because the location was suitable only for neighborhood operation, and later rejected a request for day and date first-run. Paramount wrote rejecting first-run on the ground that its business interests were best served by continued exhibition of first-run downtown, rather than in suburban areas.

The Crest opened February 26, 1949, and was licensed to play first-neighborhood-run, approximately 21 days after the end of downtown first-run, the same availability given other independent first-neighborhood-run houses.

Plaintiff's attorneys on November 1 or 2, 1949, wrote defendants asking them to experiment with the Crest; first-run, and in an exchange with Fox, asked Fox to experiment first-run day and date. Columbia and United Artists did not reply to these letters. RKO and Paramount did reply, and there is no evidence of replies by Loew's, Warner and Universal.

Prior to bringing this suit, plaintiff made offers for eight pictures to four of defendants. The reasons for their rejection are typified by the following examples. Myerberg asked for an extended first-run of "Samson and Delilah" (Paramount) and offered a guarantee of $35,000 against 50 per cent of the gross. On direct examination Myerberg said that he anticipated a run of from eight to ten weeks and a gross of over $80,000. On cross-examination it developed that this would require playing to 80,000 to 90,000 of the 105,000 people in the draw area, and Myerberg reduced his estimate to a five week run, with $50,000 gross, and failed to produced pencilled notes which he claimed to have made concerning the matter. Myerberg also asked for an exclusive first-run of "Jolson Sings Again" (Columbia), with a guarantee of $10,500 against 40 per cent of the gross, and offered to post a certified check. The film had already been shown in Baltimore first-run two months before.

Testimony of experienced persons in the industry and the testimony of experts was offered in contradiction of Myerberg's testimony in order to show that the downtown theaters in Baltimore draw a substantial number of persons from the outlying districts, such as that in which the Crest is situated. This was illustrated graphically during the transit strike in 1951 when the attendance of the showing of "Quo Vadis" was materially affected although this pic-

ture was hailed throughout as country as one of outstanding merit, and except in Baltimore, far outgrossed in its first week the earlier successful picture, "Gone with the Wind." Specific evidence tended to show that the downtown theaters draw 16.34 per cent of their attendance from the area which the Crest claims to serve and that from this area and two other outlying neighborhood areas the downtown theaters draw 37 per cent of their business.

 The plaintiff company contends that the evidence above summarized permits of no other conclusion than that the defendants knowingly and deliberately conspired to restrain trade in violation of the statutes and that this conspiracy is shown by the course of conduct which the defendants knowingly, deliberately and uniformly pursued. The burden to prove the conspiracy is upon the plaintiff and there is no direct evidence that the defendants entered into an unlawful agreement; but it is said that such an agreement must necessarily be inferred from the unanimity with which the defendants have adopted the national policy of limiting first-run pictures to downtown theaters under a system of runs and clearances, and that in accord with this policy they have denied first-run pictures but granted the first-subsequent-run of their pictures to the plaintiff.

The plaintiff rests its case to a great extent upon certain passages in the opinions in cases in the Third Circuit to which most of the defendants in the instant case were parties. In William Goldman Theatres v. Loew's, Inc., 3 Cir., 150 F.2d 738, the court found that the defendants, who controlled the exhibition of motion pictures in downtown theaters in Philadelphia, had conspired to deny a similar privilege to another completely qualified downtown theater which the plaintiff had opened. In Ball v. Paramount Pictures, 3 Cir., 169 F.2d 317, the court found that the defendant had conspired to take away from a theater first-run pictures upon the termination of the tenant's lease, and had agreed to license the tenant to display these pictures in a new location; and in Milgram v. Loew's, Inc., 3 Cir., 192 F.2d 579, the court found that the defendants had conspired to deny first-run pic-

tures to a drive-in theater somewhat removed from the center of the nearby city.

Each of these cases was tried without a jury and the circumstances of uniform action consciously taken by a number of persons were thought by the judge to justify an inference that they had engaged in an unlawful conspiracy, and certain expressions in the opinions of the Court of Appeals have led the appellant here to conclude that such an inference from uniform action is not merely permissible but compulsory, once the facts are found. Thus in the Goldman case it was said:

"* * * Plaintiff's evidence shows that there is concert of action in what has been done and that this concert could not possibly be sheer coincidence. We think there must have been some form of informal understanding. The axiom is ancient that the deed speaks for itself and that man intends the probable consequences of his act. Here, the conclusion is justified that defendants acted in concert in excluding plaintiff. This conclusion is strengthened by the circumstance that defendants 'with like unanimity, failed to tender the testimony, at their command, of any officer or agent of a distributor who knew, or was in a position to know, whether in fact an agreement had been reached among them for concerted action. * * *' (150 F.2d at page 743).

* * * * * *

"* * * Uniform participation by competitors in a particular system of doing business where each is aware of the other's activities, the effect of which is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the statutes before us." 150 F.2d at page 745.

The last quoted statement is repeated in Milgram v. Loew's, Inc., supra, 192 F.2d at page 584.

Notwithstanding these statements, we are not persuaded that it was the intention of the court to hold that it is not necessary to find that the defendants actually conspired if proof of conscious uniform action is ad-

duced. Indeed in the Milgram case the court made the following statement:

"* * * This uniformity in policy forms the basis of an inference of joint action. This does not mean, however, that in every case mere consciously parallel business practices are sufficient evidence, in themselves, from which a court may infer concerted action. Here we add that each distributor refuses to license features on first run to a drive-in even if a higher rental is offered. Each distributor has thus acted in apparent contradiction to its own self-interest. This strengthens considerably the inference of conspiracy, for the conduct of the distributors is, in the absence of a valid explanation, inconsistent with decisions independently arrived at." 192 F.2d at page 583.

Subsequently in speaking of the Goldman case the court said:

"* * * The key question in that case was whether the uniform action of all distributors in not licensing pictures on first run to Goldman was the result of a conspiracy." 192 F.2d at page 585.

See also the decisions in Westway Theater v. Twentieth Century-Fox Film Corp., D.C.Md., 30 F.Supp. 830, Id., 4 Cir., 113 F. 2d 932; Windsor Theater Co. v. Walbrook Amusement Co., D.C.Md., 94 F.Supp. 388, Id., 4 Cir., 189 F.2d 797.

In the pending case, as we have seen, the defendants offered a substantial body of evidence tending to show a certain independence of action in dealing with Crest and to explain the reasons which led the industry generally to confine the exclusive showing of first-run pictures to downtown theaters; and it is urged on behalf of the defendants that the decision as to the Crest Theatre by each defendant was based on its experienced judgment as an individual operator, since it was obvious that the grant of first-run privileges to Crest would have led to like grants to neighborhood theaters similarly situated, to the great detriment if not the destruction of the downtown houses generally. Similarly they contend that the adoption by each of them of the same solution of a problem common to the industry indicated the exercise of individual judgment rather than the formation of an unlawful conspiracy.

We think that there was evidence to support both of the inferences drawn by the opposing parties to the case and thus an issue was presented which was necessarily submitted to the jury for decision. In doing so the judge in effect instructed the jury as to the nature of an unlawful conspiracy and told them that the burden of proof was upon the plaintiff to prove the conspiracy; but that the proof might consist of direct evidence of the fact or circumstantial evidence which gives rise to a logical inference of the existence of the fact; and that in considering the evidence in the case the jury should take into consideration the similarity of business practices of the defendants in general, and with respect to the Crest Theatre in particular, in determining whether there had been a conspiracy; but that if the similarity resulted from nothing more than a common business solution of identical problems in a competitive industry the similarity of conduct would not require a conclusion that the conspiracy actually existed. We find no error in this action of the trial judge.

The plaintiff raises numerous objections to the charge of the court. The District Judge in the opening paragraphs of the charge told the jury that the suit was brought under the anti-trust acts to recover damages suffered by the plaintiff during the period from the opening of its theater up to March 20, 1950, "the date of the filing of this suit which was originally brought in Philadelphia but was transferred to this jurisdiction on defendants' motion for convenience of the parties, such being permitted since the suit might have been brought originally in this court." The plaintiff objects to the quoted passage on the ground that there was some doubt as to whether the suit could have been originally brought in Maryland against all defendants and because the right of removal was not settled until December 6, 1950 when the opinion in Paramount Theaters v. Rodney, 3 Cir., 186 F.2d 111, was handed down.

There is nothing in the case, however, to indicate that the charge as given was in-

**314**

correct in this particular either in fact or in law. The only possible detriment to the plaintiff in this connection was the disclosure of the fact that it preferred to try the case in Philadelphia whereas the defendants preferred to try the case in Baltimore. This was brought out by counsel for defendants in their closing argument; and counsel for the plaintiff replies that the case was brought in Philadelphia because of the doubts above mentioned. The plaintiff, however, manifested its reluctance to try the case in Baltimore by resisting the removal even after the right of removal was clearly established, so that the jury were in no way misled as to the essential fact.

▇ The plaintiff objects to the instruction that its claim must be judged separately as to each defendant although it was asserting the existence of a national conspiracy which happened to have its impact in Baltimore. There is nothing in the point, since in the same part as well as in other portions of the charge, the judge made it quite clear that the gist of the plaintiff's case was the existence of a combination or conspiracy of the defendants and it was necessary that the jury consider the actions of each defendant separately in order to determine whether it was a member of the combination.

▇ The instruction to the jury on the question of burden of proof is also assailed. The language objected to is contained in the following statement of the court:

"* * * The burden of proof, as I have explained to you, rests upon the plaintiff. If there was no common purpose and no uniformity of conduct between any one defendant and any of the other defendants, you may consider those facts in determining whether that defendant entered into any combination or conspiracy with any of the other defendants. It is not enough that there has been created in your minds some doubt or supicion as to the conduct of the defendants; the plaintiff must produce proof of such a nature as carries a conviction to your minds, such as would influence you in the conduct of your own business or daily affairs. The character of the proof must be such as you would be willing to act up-

on and base a judgment upon in the disposal of important matters."

It is contended that this language placed the burden of proof beyond a reasonable doubt upon the plaintiff; but obviously this is not so; and moreover, the judge, prior to making the statement, had contrasted the burden of proof in civil cases with that in criminal cases which, as he pointed out, the jury had learned from their experience in previous criminal trials. The jury were expressly told that the burden of proof in a civil case of the kind before the court is met if it is supported by what the jury finds to be the weight of the credible evidence.

▇ It is also contended that the judge should have told the jury in the words of the Third Circuit in the Goldman case, 150 F.2d 738, 745, that uniform participation by competitors in a particular system of doing business, where each is aware of the other's activities, is sufficient to establish an unlawful conspiracy, if the effect is restraint of interstate commerce. This statement standing alone would have been misleading and insufficient, for although conscious similarity or uniformity of action may give rise to a reasonable inference of conspiracy, it does not compel a finding of conspiracy. We think that this was made clear to the jury by the charge of the court. The holding in Interstate Circuit v. United States, 306 U.S. 208, 225–226, 59 S.Ct. 467, 83 L.Ed. 610, is not to the contrary. In that case the trial judge had drawn a reasonable inference of conspiracy from the concerted action of the defendants, and the defendants had failed to tender any evidence as to whether an agreement had in fact been reached, and the Supreme Court said that since the proof supported the inference of concerted action the burden rested on the defendants of going forward with the evidence to explain or contradict it. In the pending case the defendants did go forward with explanatory proof.

During the trial, the plaintiff in order to establish its charge of conspiracy against the defendants, offered in evidence the decrees issued against the same defendants by the court in United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, Id., D.C.N.Y., 66 F.Supp. 323, Id., 70 F.Supp. 53, Id., 85 F.Supp. 881.

In that case it was found that the same defendants, prior to the existence of the Crest Theatre, had conspired to restrain trade in violation of the anti-trust acts by agreeing illegally to fix prices and to impose unreasonable clearances and in other ways, and decrees of injunction were accordingly issued against them.

The evidence was admitted in the instant case under the provisions of § 5 of the Clayton Act, 15 U.S.C.A. § 16, which provides that a final judgment rendered in a criminal prosecution or in a suit in equity brought by the United States under the anti-trust laws to the effect that a defendant has violated these laws, shall be prima facie evidence against the defendant in any suit brought against him by any other party under the said laws as to all matters respecting which the former judgment would be an estoppel as between the parties thereto.

The statute was applied in Emich v. General Motors, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534, where the plaintiff sued to recover damages against certain defendants who had conspired to restrain trade in violation of the anti-trust acts, and it was held that the plaintiff was entitled to put in evidence the decree in a prior injunction suit brought by the government in which it was shown that the same defendants had entered into such a conspiracy and had effectuated it by illegally coercing the plaintiff and other persons. The decree was held to be prima facie evidence both of the conspiracy and of the effectuating acts. It was also held that the judge was free to exercise his discretion in explaining to the jury the issues decided in the prior case bearing upon the case on trial before him.

■ The Paramount decrees had no relation to the Crest Theatre since it was built after they were rendered, but they were offered to show that the defendants had entered into a prior conspiracy which was given effect when the plaintiff applied for first-run privileges. The judge resolved his doubts as to admissibility in favor of the plaintiff, and gave the following instructions to the jury:

"* * * I instruct you that in that case, which was a suit between the Government and the same defendants, which was decided and covered by the decrees in that case, these same defendants had, at a time previous to the opening of the Crest Theatre, conspired together in restraint of trade in violation of these same Anti-Trust laws, in restricting to themselves first run and in establishing certain clearances in numerous places throughout the United States. Thus, these proven facts, I instruct you, become prima facie evidence in the present case, which the plaintiff may use in support of its claim that what the defendants have done since those decrees, in the present case in Baltimore, is within the prohibition of those earlier decrees. However, this is only prima facie evidence. There was not before the Court in the prior case the present factual situation which is before you now with respect to Baltimore theatres. Therefore, it is still necessary in the present case, in order for the plaintiff to recover, for it to prove to your satisfaction by the weight of the credible evidence, that these defendants, or some of them, have conspired in an unreasonable manner to keep first run exhibitions from the plaintiff, or have conspired to restrict plaintiff to clearances which are unreasonable.

"If you find that the plaintiff has sustained this burden of proving a conspiracy as just defined, then, I instruct you that, by virtue of the terms of the decrees in the previous equity suit, which form part of the evidence in this case, the burden of proving the reasonableness of the failure to give the plaintiff first run exclusively or day and date, that is, questions of clearance, as well as the failure to give it any other clearance such as would be reasonable, rests not upon the plaintiff but upon the defendants."

We find nothing detrimental to the plaintiff in these instructions. The court correctly instructed the jury that the decrees were only prima facie evidence and not conclusive evidence of the conspiracy on which the plaintiff's case is based. This is

in accordance with the terms of the statute and with the holding in Fifth & Walnut, Inc. v. Loew's Inc., 2 Cir., 176 F.2d 587, 590, where it was held that the decision in the Paramount case was not conclusive of the question of conspiracy among the defendants in a private damage action involving a single city. See also Dipson Theatres, Inc. v. Buffalo Theatres, Inc., 2 Cir., 190 F.2d 951, 957–8.

There were other objections to the Judge's charge, all of which have been considered, but we find no error, and nothing worthy of additional comment. The judgment is therefore

Affirmed.