**CHICAGO RIDGE THEATRE LIMITED PARTNERSHIP, et al., Plaintiffs,**

v.

**M & R AMUSEMENT CORPORATION, et al., Defendants.**

**No. 82 C 3141.**

United States District Court, N.D. Illinois, E.D.

March 16, 1990.

Sheldon O. Collen, Epton, Mullin & Druth, Ltd., and Therese M. Obringer and Paul E. Slater, Sperling, Slater & Spitz, Chicago, Ill., for plaintiffs.

Robert W. Bergstrom, Ronald W. Teeple and John L. Leonard, Bergstrom, Davis & Teeple, Chicago, Ill., Philip R. Toomin, Winnetka, Ill., James G. Hunter, Jr., Latham & Watkins, Hedlund, Hunter & Lynch, Chicago, Ill., and Altheimer & Gray, Chicago, Ill., for defendants.

## MEMORANDUM OPINION/FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIAN BARNETT DUFF, District Judge.

This case comes to this court following a remand from the Court of Appeals in *Chicago Ridge Theater Ltd. v. M & R Amusement*, 855 F.2d 465 (7th Cir.1988). In the wake of that decision, the defendants have renewed their motions for judgment under Rule 41(b), Fed.R.Civ.Pro.[1] In opposing these motions, Chicago Ridge Theater Limited Partnership and F & F Management Company have asked for a new trial on the claims presented in their amended complaint.

The Court of Appeals reviewed much of the procedural history of this case in *Chicago Ridge*. This court will assume that the reader is familiar with that decision. Further, the court understands that decision as allowing the court to decide the present motions. See *Chicago Ridge*, 855 F.2d at 471 (reversing and remanding "for a new trial or other proceedings not inconsistent with this opinion").

The court will address the defendants' motions first. In considering these motions, the court

> need not view the evidence [presented at a trial of this matter] in the light most favorable to the plaintiffs but instead may weigh the evidence and assess the credibility of the witnesses. The burden of persuasion is on the plaintiffs; if at the close of the plaintiffs' case the court is not persuaded by the plaintiffs' submissions, the court should find for the defendants.

*Id.* at 467–68. The plaintiffs argue that the Seventh Circuit wants this court to consider only the testimony of their expert, Dr. Norman Bradburn, in deciding this motion. The plaintiffs rest their argument on the Seventh Circuit's reliance on the plaintiffs' representation to the appellate court that they would not object to this court's review

---

1. There are two motions. One is from M & R Amusement Corporation and Evergreen Theatre Corporation (hereafter the "Exhibitor Defendants"); the other is from Columbia Pictures Industries, Inc., Paramount Pictures Corporation, United Artists Corporation, Universal Film Exchanges, Inc., Embassy Pictures, and Orion Pictures Distribution Corporation (hereafter the "Distributor Defendants").

of Bradburn's "cold" testimony. Before relying on this representation, however, the Seventh Circuit stated that "[t]he district court may ... on remand reweigh the properly admitted evidence, ignoring the evidence improperly considered in its prior review." *Id.* at 469 n. 4. Further, the issue before the court in *Chicago Ridge* was whether the previous trial judge considered unadmitted testimony in deciding the defendants' earlier Rule 41(b) motion. The Seventh Circuit decided that he had. A simple solution to the problem, one chosen by the Seventh Circuit, was to remand for consideration of only properly admitted evidence. This suggests to this court that it may consider all of the properly admitted evidence in deciding the defendants' motions.

Pursuant to Rule 41(b), the court finds these facts: [2]

1. The plaintiffs allege violations of § 1 of the Sherman Act, 15 U.S.C. § 1 (1982). They invoke the jurisdiction of the court pursuant to §§ 4 and 16 of the Clayton Act, codified at *id.*, §§ 15 and 26, and 28 U.S.C. § 1337 (1982). See *CR* at 466.

2. The plaintiffs are:

a. Chicago Ridge Theater Limited Partnership, the lessee and operator of a movie theater known as the Chicago Ridge Theater.[3] The theater is located at 95th Street and Ridgeland Avenue, Chicago Ridge, Illinois. See *id.*

b. F & F, an affiliate of the Partnership. F & F performed certain management functions for the Partnership, including obtaining licenses for exhibition of films at the Chicago Ridge Theater. See *id.;* Stip. ¶ 2.

3. Morton and Robert Fink were partners in the Partnership and president and vice-president, respectively, of F & F. They were managing agents of both plaintiffs. See *id.* at ¶ 3.

4. The defendants are:

a. Evergreen Theater Corporation, which owned and operated the Evergreen Theater, located at 95th Street and Western Avenue in Evergreen Park, Illinois. See *CR* at 466.

b. M & R Amusement Corporation, which has its principal place of business in Skokie, Illinois. See Stip. at ¶ 8.

c. Columbia Pictures Industries, Inc. Columbia was in the business of producing copyrighted feature motion pictures and distributing feature motion pictures (its own and those of other producers) to theaters in the United States. See *id.* at ¶ 9.

d. Embassy Pictures, formerly Avco Embassy Pictures Corporation. Embassy was in the same business as Columbia.[4] See *id.* at ¶ 10.

e. Orion Pictures Distribution Corporation, formerly Filmways Pictures, Inc. Orion was in the business of distributing independently produced feature motion pictures to theaters in the United States. See *id.* at ¶ 11.

f. Paramount Pictures Corporation. Paramount was in the same business as Columbia. See *id.* at ¶ 12.

g. United Artists Corporation. United Artists was in the same business as Orion, although United Artists financed some of the features which it distributed. See *id.* at ¶ 13.

h. Universal Film Exchanges, Inc. Universal was in the same business as Columbia. See *id.* at ¶ 14.

5. The Distributor Defendants each maintained a branch office in the Chicago metropolitan area. The purpose of these offices was to license and distribute films to local theaters for exhibition. See *id.*

6. Persons in the movie business refer to operators of motion picture theaters as

Bradburn Direct Testimony: Bradburn

**2.** The court will use these abbreviations:
   *Chicago Ridge: CR*
   Pretrial Stipulations: Stip.
   Defendants' Seventh Circuit Supplemental Appendix: D.App.
   Trial Transcript: T.
   Plaintiffs' Seventh Circuit Rule 30(b) Appendix: S.App.

**3.** While not bearing on the present motion, the Partnership has sold the Chicago Ridge Theatre since the date of trial and no longer operates it.

**4.** While not bearing on the present motion, Embassy no longer exists.

"exhibitors." The persons, firms, or corporations who create the negative film which contains the completed feature motion picture in a form available for the making of positive prints suitable for exhibition are called "producers." The production cost, called "negative cost," encompasses the cost of writers, actors, directors, producers, photographers, costumes, stages, and scenery, and often runs over $1 million. From the resulting negative, companies make several hundred to a thousand or more positive prints. These prints cost $2000–12,000 each. See *id.* at ¶ 16; T. 907; D.App. 832.

7. Most films earn the bulk of their revenues during their "first run," their exhibition immediately after release. Distributors license a first run on a percentage of the exhibitor's gross receipts. License fees are known as "film rentals." The terms of a film license agreement between an exhibitor and a distributor for a first run frequently provide for a priority of run, called a "clearance," over one or more theaters in the area. The Evergreen Theater obtained clearances over the Chicago Ridge Theater for many films from each of the Distributor Defendants. See *CR* at 466 & n. 2; Stip. at ¶¶ 17–19.

8. Motion pictures vary considerably in their ability to attract an audience. Exhibitors and distributors cannot determine how successful a picture will be in advance of exhibition. The number of theaters licensed simultaneously on the same run (known as showing "day and date") was in part a function of the distributor's marketing plan. Additionally, each distributor competed with all other distributors for screens on which to play films. In some instances, because a plethora of different products were on the market, an individual distributor often could not license as many first runs as it hoped. While there were more than 225 screens in the Chicago area, exhibitors controlling 150–175 screens dedicated these screens largely to a myriad first-run films. These theaters comprised the first-run market in the Chicago area for film distributors, including the Distributor Defendants. See Stip. at ¶¶ 20–21; D.App. at 142, 768; T. 563-4, 1040, 1150.

9. For many years, some of the Distributor Defendants licensed first runs of selected films in limited, key areas of the country, then gradually increased the number of theaters showing the film on successive runs. Their aim was to attract the most film-goers, and maximize film rentals. Their practice allowed economies in the use of positive prints of films, permitted favorable word-of-mouth publicity to build, attracted additional exhibitors to the film on the basis of its early showings, and gave film-goers more time to determine whether they wished to see a given picture. It often increased the total business for popular films. For this reason, some distributors did not attempt to maximize the number of simultaneous first runs for a film. For example, one distributor licensed "Sophie's Choice" for an exclusive run at Chicago's Carnegie Theater. Other films subject to this practice were "Amadeus," "A Passage to India," and "A Soldier's Story." Distributors in the Chicago area usually limited first runs to 10–15 theaters. These distributors considered geographical coverage in determining which theaters received licenses. See D.App. at 567–68, 768–70, 832–34, 880–81.

10. At and prior to the time the Chicago Ridge Theater opened for business, each of the Distributor Defendants licensed first runs in the Chicago area by negotiation and competitive bidding. In anticipation of the release of a particular film, the Chicago branch office of the film's distributor would send a written invitation to bid to all area exhibitors. Bid invitations set forth the date on which the picture would be available, and suggested a minimum film rental, opening date, minimum playing time, holdover terms, sharing of advertising expenses, and advances. Sometimes the invitation indicated whether the distributor offered the film for exclusive exhibition, multiple exhibition, or both. The invitation specified the date and time within which the distributor's branch office had to receive bids in order to consider them, and reserved to the distributor the right to reject all bids. See *id.* at 207–8, 352–54, 586–87, 754, 770, 834–35, 860, 864–69, 874.

11. Exhibitors responded to bid invitations by submitting written offers of terms, or by writing that they were willing to negotiate for exhibition if the distributor did not accept a bid. The branch managers of the distributors opened bids on the bid date and forwarded them to the regional or home office of the distributor for evaluation. Frequently the branch manager would forward his or her recommendation as well. The regional or home office made the final decision on the bids, and it instructed branch managers to notify exhibitors either that the distributor had accepted a bid or that it had rejected all bids. See pages cited in Finding 10 above.

12. If the distributor rejected all bids, it instructed the branch manager either to solicit new bids or to negotiate to secure the best agreement possible. When the distributor chose the latter course, the branch manager notified exhibitors. Some managers notified only those exhibitors who responded to the bid invitation with a bid or a stated willingness to negotiate; other managers notified all exhibitors. If in the former situation the manager had received only one bid or "willing to negotiate" letter, the negotiation would be noncompetitive. See pages cited in Finding 10 above.

13. Exhibitors and distributors generally negotiated over the telephone, and frequently confirmed their terms in writing. All negotiations were picture-by-picture and theater-by-theater. Offers received through negotiation were subject to approval by the distributor's regional or home office. See pages cited in Finding 10 above and D.App. at 566.

14. When responding to invitations for bids, in most instances exhibitors preferred to negotiate for film licenses instead of bidding. The record contains only a few examples of competitive bidding among Chicago-area exhibitors. The bids received in response to an invitation to bid often differed from the minimum terms suggested by the distributors. See *id.* at 192, 237, 550, 570, 615.

15. Final acceptance of an offer—whether by bid or negotiation—was followed by a written license agreement. This agreement specified the theater and screen at which the film would be shown, the opening date, length of engagement, the terms (if any) on which the exhibitor would hold the picture after the initial term, whether the exhibitor had a right to exclusive showing, and the film rental. See pages cited in Finding 14 above.

16. The Chicago Ridge Theater opened for business on August 1, 1981, upon completion of two screens and auditoriums. The theater later added a third screen, giving it auditoriums seating 1,180, 700, and 600 persons respectively. The owners subsequently divided the 700–seat auditorium into two 330–seat theaters. See Stip. at ¶¶ 5–6; T. 200.

17. At the time the Chicago Ridge opened, the Evergreen Theater had three screens and auditoriums seating 1,232, 952, and 650 persons respectively. Prior to the time of trial, the owners of the Evergreen split its 952–seat theater into two auditoriums of 500 and 475 seats respectively. The Evergreen is 6.1 miles from the Chicago Ridge. See *id.* at 207; Stip. at ¶ 7; *CR* at 466.

18. At the time the Chicago Ridge was under construction, the Ford City Theater, at 76th Street and Cicero Avenue in Chicago, Illinois, was operating with three screens and auditoriums seating 1,200, 900, and 850 persons, respectively. This theater was about 4.5 miles from the Chicago Ridge. During construction of the Chicago Ridge, the owners of the Ford City Theater constructed a separate building 0.9 miles east of the Ford City Theater, at 76th Street and Pulaski Road in Chicago. This new theater housed three auditoriums, each seating approximately 375 persons. The owners dubbed this new theater "Ford City East." They called their original theater "Ford City West." See T. 201, 205–06.

19. For two and one-half years after the Chicago Ridge opened, the Ford City West requested and obtained film licenses providing for clearance over the Chicago Ridge. In December 1983, the owners of Ford City West remodeled the theater, splitting its largest auditorium into two 250–seat theaters and one 500–seat theater.

Ford City West then had five auditoriums. It soon ceased to request clearance over the Chicago Ridge, except when both the Evergreen and the Chicago Ridge intended to play the same picture. Plaintiff's officers have testified that the Ford City West competes with the Chicago Ridge, and that both theaters lose revenue when playing a film day and date. See T. 201, 203, 450–51, 475, 499–500, 563; D.App. 231–35, 313, 337, 706.

20. At the time the Chicago Ridge opened, and for some time thereafter, there was a theater named the Coral at 95th Street and Cicero Avenue in Chicago, Illinois. From time to time the plaintiffs licensed first-run films pursuant to licenses giving the Chicago Ridge a clearance over the Coral. The Coral went out of business before trial in this case. See D.App. at 770–73, 778, 803, 837; T. 313–14, 360–61, 535.

21. Shown in Appendix A is a diagram indicating the distances separating the theaters which the court has discussed previously in this opinion. See also D.App. at 768–70, 776–78.

22. Before the plaintiffs built the Chicago Ridge, the landlord of the shopping center where the theater now sits, Ken Tucker, showed Morton Fink a market study by Property Consultants, Inc. Fink read the study. It stated that the trade area for the shopping center "includes all or most of Chicago Ridge, Oaklawn, Evergreen Park, Hometown, Burbank, Hickory Hills, Palos Hills, Palos Park, Palos Heights, Marionette Park, Worth, Alsip, Bridgeview, Bedford Park, Summit, Justice, and Willow Springs [Illinois]." Fink noted from the study a map showing the Chicago Ridge trade area, which included the Evergreen Plaza. See *id.* at 356–57.

23. Tucker also showed Fink a market study by George Freirich and Associates. Fink read this study too. The study said in part: "Given consumer reactions to Chicago Ridge's attributes and the declining interest in existing retail mall facilities, Chicago Ridge should be able to meet its market share requirements by pulling a major portion of consumer shopping trips away from Orland Square, Ford City and especially Evergreen Plaza." *Id.* at 359.

24. At the time Fink began to plan construction of the Chicago Ridge, there was at the proposed site a theater called the Studio. General Cinema Corporation had operated the Studio up to 1978. The Evergreen often obtained clearances over the Studio. Fink knew this, but did not regard it as important since he did not consider the Studio to be a first-run theater. He also believed that his bigger theater would attract patrons from a wider geographic area than the Studio ever had. See *id.* at 263–69, 315–24; T. 337, 457.

25. Plaintiffs put in evidence a statistical survey conducted by Dr. Bradburn, a professor in the Department of Behavioral Sciences and the Graduate School of Business at the University of Chicago. They also called Dr. Bradburn as an expert. Dr. Bradburn is not an economist, and he did not give an opinion in his direct testimony whether the Chicago Ridge and the Evergreen were in substantial competition. Dr. Bradburn is a leading expert in survey research. In his report, Dr. Bradburn wrote that his "best estimate of the net loss of patronage to the Evergreen theater, if it played a picture day and date with the Chicago Ridge Theater, would be 7–8% for the picture." See S.App. 89, 121; T. 584, 602.

26. Dr. Bradburn conducted a telephone survey of a sample of persons living within an area bounded by four streets, each located approximately five miles from the Evergreen. The western boundary was Ridgeland Avenue, the street on which the Chicago Ridge is located. Dr. Bradburn thus excluded any Evergreen patron who lived west of the Chicago Ridge from his survey. Dr. Bradburn also excluded persons who had not gone to a movie within the previous three months. This excluded 1,814 of the 3,108 persons whom Dr. Bradburn interviewed. See T. 585–90, 669–70.

27. Dr. Bradburn asked those whom he fully interviewed (1,294 persons) about their attendance at various theaters, including the Evergreen and the Chicago Ridge, over the preceding twelve months. He

then asked each person to identify the next movie he or she wanted to see. After identifying that movie, the person was asked which theater he or she would go to if that movie were showing only at the Chicago Ridge and the Evergreen. See Bradburn 14–15.

28. Dr. Bradburn's survey showed that 62.2% of the people who had been to the Chicago Ridge three or more times in the past year had been to the Evergreen. Forty percent of those responding to his survey who described themselves as regulars at the Chicago Ridge had attended the Evergreen in the last twelve months. Nearly 34% of the respondents who had visited the Evergreen three or more times in the past year also had visited the Chicago Ridge. Just over 27% of the respondents who described themselves as regular customers of the Evergreen had visited the Chicago Ridge during the past year. A little over 59% of the theater patrons who responded to Dr. Bradburn's survey had attended the Chicago Ridge three or more times in the past year, and had attended the Evergreen at least once in the past year. Of those persons who lived within five miles of the Evergreen and who responded to Bradburn's survey, 38.3% had attended the Chicago Ridge in the last year. See D.App. at 367, 370, 378, 376.

29. Of all of the respondents in Dr. Bradburn's survey who had attended the Evergreen in the past year, 26% would choose the Chicago Ridge if the theaters played day and date. Among those respondents who had attended the Evergreen one or two times in the past year, 32.8%—35.1% when weighted for household size and number of telephones—would go to the Chicago Ridge instead of the Evergreen if the two theaters were playing the same picture day and date. Among those who had attended the Evergreen three or four times in the past year, 19%—16.7% when weighted—would have attended the Chicago Ridge instead if the two theaters had been playing day and date; of those who attended the Evergreen five or more times, 19.1%—20.2% when weighted—would prefer the Chicago Ridge if it were playing a picture day and date. See T. 620, 626, 629–30, 650–51; Plaintiffs' Exhibit MX–3–J.

30. Dr. Bradburn estimated that overall the "gross" loss to the Evergreen if the Chicago Ridge played a movie day and date with it would be 19.2% of total paid admissions received by the Evergreen in the last twelve months. In his written report and his testimony in court, Dr. Bradburn also described "net" losses which the Evergreen would suffer if it and the Chicago Ridge were to play day and date—that is, the Evergreen's gross loss to the Chicago Ridge, less those customers wrested from the Chicago Ridge. Dr. Bradburn based his "net" estimate on what would happen if the Chicago Ridge played each and every film featured at the Evergreen. He explained the logic behind his estimate:

> [I]f clearance[s] are removed, which is the hypothetical we are trying to investigate here, ... everybody's behavior would change. That is, the exhibitors' behavior would change, the distributors' behavior would change, and the customers' behavior would change. And this is the notion—the notion ... is that there are people who are now not going to Evergreen, who would like to go to Evergreen, ... that would be their preference, if they were showing pictures that they would want to see, and it would be in Evergreen's interest to try to capture that market. There are some that would move away and a net—more would move away than would come in. That is, the distributors would change their behavior, and the customers would also then have a freer choice to go to the theater they want to for the pictures they want to. That is, it's sort of removing an imperfection from the market, which is what clearance does, and lets the adjustments then occur.

Dr. Bradburn testified, however, that the "gross" figure would be the loss to the Evergreen were the Chicago Ridge to (1) add a film playing at the Evergreen to an existing repertoire of films which did not duplicate those films featured at the Evergreen, and (2) retain its repertoire despite the addition. Dr. Bradburn was unable to say which figure, "gross" or "net," would

describe the situation where the Chicago Ridge forfeited one film in a non-duplicative repertoire to exhibit a film shown simultaneously at the Evergreen. Dr. Bradburn also did not calculate "net" figures when a particular film ran day and date at both the Chicago Ridge and the Evergreen. See T. 651–59, 737–40.

31. Dr. Bradburn's field researchers had conducted two "pretests" before Dr. Bradburn took the survey discussed in Findings 25–30. The researchers made these pretests at Dr. Bradburn's suggestion. These tests showed that 83.9% of the respondents who lived in an area between the Evergreen and the Chicago Ridge had been to the Evergreen. Nearly 79% of these persons said that they would go to the Chicago Ridge if the same film were showing at both theaters. See T. 634–642, 695–700, 718.

32. Morton Fink testified that most of the patrons of the Chicago Ridge live in the City of Chicago. Most of the areas of the City of Chicago from which the Chicago Ridge draws its patrons are closer to the Evergreen than they are to the Chicago Ridge. Robert Fink testified that if the Evergreen had a clearance over the Chicago Ridge, it would have higher gross admissions. He could not quantify the increase. Morton Fink testified that the Chicago Ridge drew patrons from Evergreen Park. He opined that if either the Chicago Ridge or the Evergreen had a clearance on a particular film reaching as far as Chicago's downtown Loop, either theater could draw patrons from as far as the Loop. Fink also believed that although the River Oaks Theater was 10–12 miles from the Evergreen, the Evergreen competed with the River Oaks, and it was possible that the Evergreen drew patrons from the area surrounding River Oaks. Fink thought that the Evergreen could draw patrons from the Bolingbrook Theater in Lemont, 12 miles west of Chicago Ridge.

When the Chicago Ridge opened, it was Fink's belief that the Chicago Ridge would draw patrons from the Orland Square Theater, 10 miles to the southwest. In the opinion of Robert Fink, the Chicago Ridge would pick up more customers if it had clearance over the Orland Square. Morton

Fink thought that the Ford City West loses patrons and profits when it plays a film day and date with the Chicago Ridge. See D.App. at 297, 300–01, 303, 335, 343, 684, 709; T. 403–08, 426, 497.

33. In the opinion of Richard Rosenfield, vice-president of Evergreen Theaters Corporation and the person primarily responsible for booking films at the Evergreen, the Evergreen would lose substantial revenues on any film playing at the Evergreen if it were playing simultaneously at the Chicago Ridge. He estimated that if the two theaters played day and date, the Evergreen would lose over 15% of its total admissions and over 16% of its total profits. This is why he requested clearance over the Chicago Ridge. See D.App. at 536–79; T. 835.

34. Michael Share is the Chicago branch manager for Paramount. Share considered the type of picture, whether he wished to license the picture in a limited fashion, the location of the theater, the theater's personality, its past performance, its potential revenues, and the terms of the proposed contract in considering whether to license a film to a theater. Paramount negotiated each license with the Evergreen picture by picture. Share gave clearances to the Evergreen because he had decided, based on his study of the two theaters, that they were in substantial competition. See D.App. at 582–95.

35. James Goldschlager was the branch manager for Columbia in Detroit, Chicago, and San Francisco. He had visited the Chicago Ridge/Ford City/Evergreen area on numerous occasions. He found that the Chicago Ridge and the Evergreen shared 95th Street. He drove more than once at about 9 p.m. in order to attend a 9:30 p.m. show. It took him 10–15 minutes to travel between the two theaters. Goldschlager also has looked at the historical gross theater revenues from the area. Based on this information and his experience, Goldschlager believed that the Chicago Ridge and the Evergreen competed in the same market. See *id.* at 176–203.

36. There are other sworn statements in the record supporting the facts found in

Findings 34–35 from William Gehring, branch manager of Universal; E. Jeffrey Williams, branch manager of United Artists; Paul Silk, Chicago District Manager of Orion; Edward Schuerman, branch manager of Embassy; and Messrs. Osborne, Siegel, Mitchusson, and Gillis, of Columbia, Orion, Embassy, and Paramount, respectively. In the opinion of Victor Bernstein, branch manager of Filmways, only one theater in the Chicago Ridge/Ford City/Evergreen area should exhibit a particular film. See *id.* at 753–891; 220–24.

## CONCLUSIONS OF LAW

This court has jurisdiction over this matter pursuant to 28 U.S.C. 1337, and venue is proper in this district. As the Seventh Circuit noted in its opinion, historically the courts have held that clearances such as those obtained by the Exhibitor Defendants, see Finding 7, are unlawful between theaters which are not in substantial competition. See *Chicago Ridge*, 855 F.2d at 470–71. This is the theory under which the parties tried this case. The first issue is thus whether the plaintiffs have proven that the Evergreen and the Chicago Ridge are not in substantial competition.

The decision which produced the "substantial competition" test for theater clearances, *United States v. Paramount Pictures*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), does not define substantial competition. Competition generally "depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another." *United States v. du Pont & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956). The commodities at issue in this case are theater viewing screens, as the primary parties are exhibitors of films. See Findings 2, 4(a)–(b), 6, 16–17.

Courts presented with the question of the presence or absence of competition should examine as much information as is presented to them. While in some cases the court may find substantial competition from one piece of information—for example, knowing that the theaters are within blocks of one another, see *A.L.B. Theatre Corporation v. Loew's Incorporated*, 355 F.2d 495, 501 (7th Cir.1966) (theaters fourteen blocks apart in substantial competition)—the absence of the same critical factor will not necessarily result in a contrary result. See, for example, *Theatre Enterprises v. Paramount Film Distrib. Corp.*, 201 F.2d 306 (4th Cir.1953), aff'd 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954) (substantial competition between theaters six miles apart); *Ayers v. Pastime Amusement Company*, 283 F.Supp. 773 (D.S.C. 1968) (substantial competition between theaters twenty-six miles apart).

The Chicago Ridge and the Evergreen are 6.1 miles apart. They have the same number of auditoriums, with similar capacities. See Findings 16–17. A larger facility which is 1.6 miles closer to the Chicago Ridge, the Ford City West, competes with the Chicago Ridge, by the plaintiffs' own admission. See Findings 19, 32.[5] The plaintiffs also sought and received clearances over the Coral, a theater 2.3 miles away, see Findings 20–21, which indicates that the plaintiffs believed a theater at least that close to the Chicago Ridge substantially competed with them.

Many materials which the plaintiffs studied prior to building the Chicago Ridge indicated to them that their market could sweep wider than a radius of 4.5 miles. These materials suggested that the Chicago Ridge's market covers part of the area which Dr. Bradburn canvassed in his survey. See Findings 22–24. The plaintiffs' subsequent experience showed that the Chicago Ridge's market overlapped with the Evergreen's. Moreover, they believed that the Chicago Ridge could draw patrons from as far as twelve miles. See Finding 32. Employees of the defendants likewise testified that the Chicago Ridge and the Evergreen competed with one another. See Findings 33–36.

All of this failed to impress the plaintiffs, who perhaps were looking for something

---

**5.** Since the owners of the Ford City West did not testify at trial, the court cannot determine why they sought clearances over the Chicago Ridge less frequently once they had remodeled their theater.

more precise than their own hunches, the puffery of marketing surveys, and the opinions of the defendants. This was understandable, as *Paramount* requires the plaintiffs to show the absence only of *substantial* competition, not the absence of all competition. They thus commissioned Dr. Bradburn to conduct a survey. Dr. Bradburn is an expert in surveys. See Finding 25. He and his associates took two preliminary samples in an area between the Chicago Ridge and the Evergreen. These tests showed that nearly 84% of the persons had been to the Evergreen; nearly 79% said they would go to the Chicago Ridge if that theater were showing the same film day and date as the Evergreen. See Finding 31.

Still, this was a pretest. For his final survey, Dr. Bradburn shifted his boundaries. He moved his western boundary to the east, so it ran along Ridgeland Avenue, the street shared by the Chicago Ridge. He moved his eastern boundary substantially east of the Evergreen to Jeffrey Boulevard, and extended his northern and southern boundaries as well. Understandably, his surveys began to show a higher percentage of Evergreen loyalists—persons who would go to the Evergreen regardless of whether the Chicago Ridge were showing the same film day and date—as his survey covered an area which for the most part is closer to the Evergreen than to the Chicago Ridge. Still, his figures showed that persons living in the area attended both theaters, and significant numbers would shift allegiances were the theaters to show the same film day and date. See Findings 25–29.

Bradburn was not finished with his work for the plaintiffs, however. He delivered his final opinion that were the Evergreen and the Chicago Ridge to play day and date, the Evergreen would lose 7–8% of its patrons on a "net" basis. See Finding 25. Dr. Bradburn's explanation for the "netting" effect lacked foundation in the evidence and reflected an opinion which he

was not qualified to give. The court refers to Finding 30, where Dr. Bradburn explains his "net" figure. Dr. Bradburn opined that were clearances removed, "everybody's behavior would change"—that of consumers, exhibitors, and distributors. Dr. Bradburn's survey and his expertise qualified him to report only that consumer behavior would change. The plaintiffs did not qualify Dr. Bradburn as an expert on exhibitor or distributor behavior. In fact, the only evidence in the record is that even without negotiated clearances, distributors would limit the number of first run licenses when marketing certain films. See Findings 6–15. Dr. Bradburn admitted that he calculated his "net" figure assuming that exhibitors and distributors would respond to the absence of clearances in only one way. He admitted that the "net" figure would rise if distributors limited their licenses of first runs. See Finding 30.

■ The first-hand observations and opinion evidence in the record, market estimates, the results of Dr. Bradburn's surveys and the geographic proximity of the Chicago Ridge and the Evergreen lead the court to conclude that the theaters substantially compete. The court rejects the "net" estimate proffered by Dr. Bradburn as lacking foundation in the record and being outside the scope of Dr. Bradburn's expertise. Accordingly, the plaintiffs have not met their burden in showing that the clearances which the Distributor Defendants granted to the Exhibitor Defendants were illegal under *Paramount,* and thus the court must enter judgment in favor of the defendants.[6]

Anticipating this possibility, the plaintiffs have moved to reopen their case to present a different theory of liability than the one which they originally tried. They call it their "modern rule of reason case." Ironically, it appears that the defendants essayed this theory to defeat the plaintiffs before the Seventh Circuit; now the plaintiffs try to put the modern-rule-of-reason

---

**6.** This court shares the view expressed in *Chicago Ridge Theatre Ltd. Partnership v. M & R Amusement Corp.,* No. 82 C 3141, mem.op. 12 (N.D.Ill. Feb. 22, 1983), and arguably approved by the Seventh Circuit in *Chicago Ridge,* 855

F.2d at 470, that the plaintiffs cannot prevail on one of their alternative theories of liability, called the "conspiracy theory," if they fail to prove that the Chicago Ridge and the Evergreen were not in substantial competition.

"shoe" on their foot. They have good grounds to try to do so, as *Chicago Ridge* noted that "a lot of water has passed under the bridge" since the Supreme Court's decision in *Paramount*. The Seventh Circuit left it to this court to explore the matter further. See *Chicago Ridge*, 855 F.2d at 470–71.

The decision whether to reopen the plaintiffs' case turns on the history of this lawsuit. The plaintiffs filed this case in 1982. They stated two counts in their complaint. Count 1 alleged that the defendants illegally boycotted the plaintiffs. Count 2 alleged that each of the Evergreen's clearances over the Chicago Ridge was illegal, as the Evergreen and Chicago Ridge were not in substantial competition. See *id.* at 466–67; Complaint (May 20, 1982).

■ On February 22, 1983, the court denied the defendants' motion for summary judgment and narrowed the issues in this case. See *Chicago Ridge*, 855 F.2d at 467. This ruling came before judgment in this case, and despite all that has happened since—the court's original judgment pursuant to Rule 41(b) and the Seventh Circuit's reversal of that judgment—that ruling stands. It has not become the Seventh Circuit's law of the case. That doctrine applies following an appeal only to those matters presented to and actually decided by the appellate court. See *Parts and Elec. Motors, Inc. v. Sterling Elec.*, 866 F.2d 228, 231–32 (7th Cir.1988). This court thus has the discretion to make a different determination of any matter not yet taken to judgment or determined on appeal, including its February 22, 1983 order. See *Cameo Convalescent Center, Inc. v. Percy*, 800 F.2d 108, 110 (7th Cir.1986).

■ While this court has the power to modify its earlier order, the court believes it would prejudice the defendants to do so in this case. The record of this case demonstrates that the "modern rule of reason" case occurred to the plaintiffs very late in trial. As noted before, the court narrowed the issues for trial on February 22, 1983.

The plaintiffs moved for reconsideration of this order on March 3, 1983. They raised four arguments, but did not present the modern rule of reason theory in this motion.[7] As the court rightly noted at the time, the motion to reconsider raised no new issues or theories about the defendants' potential liability.

On June 22, 1983, the plaintiffs amended their complaint. The defendants moved for summary judgment once again, contending that since the theaters were in substantial competition, the Evergreen's clearances over the Chicago Ridge were lawful. In their written brief in opposition to this motion, the plaintiffs did not argue that they could demonstrate the defendants' liability under the modern rule of reason. Indeed, the plaintiffs continued to believe that *Paramount* controlled, and that the "key issue" was "whether the theatres are in substantial competition...." See Brief of Chicago Ridge ... In Opposition to Renewed Motions of Defendants for Summary Judgment 2, 7–18 (Aug. 13, 1984). The court agreed with the plaintiffs in denying the defendants' motion—a decision which no one asked the court to reconsider prior to trial. Substantial competition quite firmly remained the central issue in this case.

The court held trial in this matter in January 1985. Sheldon Collen, one of the plaintiffs' attorneys, argued in his opening statement that "the issue of liability revolves about the question of whether the theaters are in substantial competition." T. 12. While he briefly suggested that the presence or absence of competition bore a relation to whether a clearance was pro- or anti-competitive, the focus of his argument clearly was substantial competition. Collen acknowledged that the plaintiffs bore the burden of proof in showing the absence of competition. T. 17–18.

The defendants too focused on substantial competition in their opening statements. After hearing the opening arguments, the court observed yet again that

---

7. Before the Seventh Circuit and this court the plaintiffs have represented that they did present the modern rule of reason theory in their March 1983 motion. At best, the plaintiffs strain the meaning of "presentation"; at worst, the plaintiffs misrepresent the content of that motion. One must read a great deal between the lines of the March 1983 motion to learn of the theory which the plaintiffs present to the court now.

substantial competition was the key issue. No one demurred. T. 114–18. The court then heard evidence over several days, much of it centering on the extent of competition between the theaters, and listened to arguments at the close of the plaintiffs' case. The plaintiffs presented their closing argument through two attorneys, Collen and Paul Slater. Collen spoke again of the importance of the question of substantial competition. He admitted that the plaintiffs' burden was peculiar, as they had to prove a negative: the absence of competition. Still, the issue in the case was the degree of substantial competition. T. 1459–60. With only a few lapses—there are points in his argument where Collen describes the central issue as "the substantiality of the effect of competition of the clearance"—Collen argued that the competition between the theaters was not substantial enough to justify the defendants' practices. T. 1477–89.

Attorney Slater tried to sing a different tune. From the start of his portion of the plaintiffs' closing argument, Slater argued that "we are proceeding under the rule of reason, which is what your Honor ordered in your February 22, 1983 opinion. As in any other rule of reason case, what we are going to try and establish here is that, on balance, the challenged conduct is anti-competitive as opposed to pro-competitive." T. 1491. As the Seventh Circuit noted in *Chicago Ridge*, this is the central inquiry in a modern rule of reason case, and Slater was correct in suggesting that a court could apply this analysis to clearances. But the court was quick to note that the plaintiffs had never previously asked the court to proceed under this theory:

> THE COURT: If that is the case [that a court should weigh clearances for their pro- and anti-competitive effect], why didn't you file a motion for reconsideration when I wrote the summary judgment opinion and told you how we were going to try this case? Because you are telling me that I am supposed to now look at the—in a holistic way at the totality of the facts and decide whether the restraint is reasonable, and I conclude that it isn't, then there is no pro-

competitive reason for it, and if I conclude that it is, there is.

> You are putting the cart before the horse, I suggest to you, Mr. Slater. And you are not trying the case in accordance with the guidance I gave you in the opinion.

T. 1492–93. Slater replied that he did not feel that he had said anything inconsistent with the court's prior opinions, and returned to the topic of substantial competition. T. 1494. The defendants did not refer to the modern rule of reason theory in their closing argument.

The court agrees with the plaintiffs that the proper way to have evaluated the Evergreen's clearances was, or is, under the modern rule of reason. See *Three Movies of Tarzana v. Pacific Theatres, Inc.*, 828 F.2d 1395, 1398 (9th Cir.1987) If nothing else, it would have freed the plaintiffs from having to prove a negative proposition, and put this case in line with antitrust cases more recent than *Paramount*. Indeed, had the plaintiffs raised the theory in a timely motion for reconsideration of this court's February 23, 1983 opinion, the court would have given the motion great consideration, and probably would have jettisoned (or at least substantially augmented) *Paramount*'s analysis.

But the plaintiffs had chosen their field of battle, and never asked for reconsideration. They were content with their theory until now, and now is too late to do anything about it. The events in this case are over five years old. Discovery is over, and the court has held a trial. The plaintiffs had at least three opportunities prior to trial to present this case under a modern rule of reason theory. They chose not to, and the court's procedural misstep in its prior Rule 41(b) judgment should not change the effect of the plaintiffs' choice. It is regrettable, but it is the plaintiffs themselves who have deprived the court of the chance to apply the more appropriate theory of law to this dispute. The Seventh Circuit merely has noted, but not corrected, the plaintiffs' tactical choice. Having considered the directions of that court and all of the elections of the plaintiffs up to now,

this court finds no reason to release the plaintiffs from their first strategy at this late date.

The court enters judgment in favor of the defendants. The plaintiffs' motion to reopen their case is denied.

## APPENDIX A

0.9 mi.

FORD CITY WEST    FORD CITY EAST

4.5 mi.

CHICAGO RIDGE    CORAL    EVERGREEN

6.1 mi.

76th

Ridgeland    Cicero    Pulaski    Western

95th